Carol GREENSPAN, Carolyn Madden, Ora Lee Jasper, Tommie Belleau, Diane T. Kula and Altha Brown, Individually and on behalf of all persons similarly situated, Plaintiffs,

v.

AUTOMOBILE CLUB OF MICHIGAN, Detroit Automobile Inter-Insurance Exchange, Motor Land Insurance and Group Insurance Company of Michigan, Defendants.

Civ. A. No. 5–72249.

United States District Court, E. D. Michigan, S. D.

Feb. 14, 1980.

Harry T. Ward, Jr., C. Michael Kimber, Ronald Reosti, Jane Burgess, Marilyn Mosier, Focus Hope, Neal Bush, Detroit, Mich., for plaintiffs.

Joseph A. Sullivan, Lloyd C. Fell, Detroit, Mich., for defendants.

## OPINION

FEIKENS, Chief Judge.

### Introduction

On December 4, 1972, a group of employees at the Automobile Club of Michigan filed a class action against their employer charging discrimination on the basis of race and sex in matters related to their employment. The Honorable Charles W. Joiner, to whom the case was assigned, entered an Order on July 30, 1974, denying Plaintiffs' motion for class certification on the ground that a serious possibility of conflict within the purported plaintiff class existed with respect to the claims of the female and black employees respectively. In particular, Judge Joiner noted the danger of competing and potentially contradictory objectives of the race and sex claimants which might arise during the course of trial or in the formulation of any relief to which the class might be entitled.

As a result of that order, female employees of the Automobile Club filed a separate action on November 17, 1975, alleging discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* That case was assigned to me by random draw. Named as Defendants in this suit are the Automobile Club of Michigan, the Detroit Inter-Insurance Exchange, the Motor Land Insurance Company, and the Group Insurance Company of Michigan.[1] The Club provides its

---

1. Throughout this opinion, Defendants will be referred to as "Defendants," "the Club," or "the Company," and the Plaintiffs referred to as "Plaintiffs," or, where required, the name of an individual Plaintiff will be used.

members with various insurance and travel-related services. The Exchange is a reciprocal insurance exchange operating in this State which provides insurance to Club members and owns the property on which the Club headquarters is located. Both Motor Land Insurance Company and Group Insurance Company are wholly-owned by the Exchange and also provide insurance coverage to Club members.

Defendants have their corporate headquarters in Dearborn and also operate many branch offices throughout the State. Defendants share many of the same employees, management staff, and office facilities, including a single Personnel Department, which generally does the hiring for all employees below the rank of assistant manager. The Personnel Department is responsible for the completion and filing of various governmental reports concerning employment patterns.

The named Plaintiffs bringing this action are Carol Greenspan, Carolyn Madden Hall, Ora Lee Jasper, and Altha Brown, who are suing on behalf of themselves and all other women similarly situated. In an opinion of this Court entered on December 28, 1976, Plaintiff Jasper was designated the representative of women currently employed at the Club, Plaintiff Greenspan the representative of former employees, and Plaintiff Brown the representative of women who might be or might have been employed by the Club (i. e., applicants for employment). At the time of the opinion, Plaintiff Hall was a current employee of the Club, but has since terminated her employment and may therefore have interests similar to former employees. I do not believe that her status as a current or former employee is material to the resolution of the issues in this case, particularly as no segment of the class is left unrepresented by her termination.[2]

The class was finally defined on May 19, 1977, as being "all women employed by Defendants in Michigan who claim to have suffered discrimination based on sex on or subsequent to June 10, 1974;" "all women formerly employed by Defendants in Michigan who claim to have suffered discrimination based on sex on or subsequent to January 8, 1974;" and "all women who might be or might have been employed by Defendants in Michigan who claim to have suffered discrimination based on sex on or subsequent to January 8, 1974." [3]

Plaintiffs challenge the entire spectrum of employment practices at the Club which relate to hire, promotion, compensation, and other conditions of employment affecting Defendants' female employees. Plaintiffs allege that a majority of Defendants' employees are women, that the vast majority of these women are, in turn, relegated to low-paying clerical positions within the Company, and that nearly all of the supervisory positions occupied by women involve supervision of clerical employees. In addition, Plaintiffs allege that women are greatly underrepresented in the higher-paying professional, technical, and sales (hereinafter "PTS") positions, which, they claim, are the traditional routes of promotion to positions of greater responsibility and higher compensation in the company.

Plaintiffs claim that this situation is the result of certain policies and practices, among them: the use of various pre-employment techniques, including inadequate or non-existent posting of job openings, which cause females to be routed or assigned to positions traditionally occupied by women and to be systematically excluded from consideration for the higher-paying jobs at the Club; hiring and promotion practices which rely heavily on the subjective evaluations of primarily male supervisors and department heads, and which re-

2. In addition, the suit was initially brought by employees Tommie Belleau and Diane Kula, who were subsequently removed as named plaintiffs (though not as class members) for failure to obtain notices of their right to sue from the Equal Employment Opportunity Commission. Order of July 13, 1977.

3. The Certification Order of May 19, 1977, is reprinted as an appendix to this opinion.

sult in the denial of equal employment and promotional opportunities for women; compensation policies, which either pay male employees a higher wage than female employees doing the same job or which cause women to receive lower rates of pay for jobs which, though similar in function and performance to those held by men, have different job titles or descriptions; and a maternity policy which requires the termination of pregnant employees and the loss of employment benefits and opportunities upon rehire.

Plaintiffs seek declaratory and injunctive relief if this Court finds that Defendants' various policies and practices violate Title VII. Plaintiffs request a court-ordered affirmative action plan designed to increase the representation of women in those areas of the Company in which they presently appear in lesser proportion than their overall numbers might suggest. Finally, Plaintiffs seek back pay and other payments to compensate them for the loss of wages and employment benefits incurred as a result of Defendants' illegal discrimination against them.

At the close of their case, Plaintiffs sought to amend their complaint to reinstate a claim for mental distress caused by Defendants' alleged harassment as a result of the women's efforts to improve their conditions of employment. The claim had originally been made under Title VII, but was withdrawn by counsel following the holding in *Schroeder v. Dayton-Hudson Corporation*, 456 F.Supp. 652 (E.D.Mich. 1978), that such claims could not be raised under that statute. Nonetheless, in *Freeman v. Kelvinator, Inc.*, 469 F.Supp. 999 (E.D.Mich.1979), claims for mental distress were held to be properly brought under the Michigan Elliott-Larsen Civil Rights Act, M.C.L.A. § 37.2101 *et seq.*, and Plaintiffs base their motion on that authority. As Defendants point out, however, the motion

was not timely raised in view of the fact that Plaintiffs had completed their direct case and Defendants were prepared to go forward with their evidence in response. In addition, Defendants are ready to assert their right to a jury trial on this damage issue, which conceivably would have entailed rehearing portions of Plaintiffs' case. Although Plaintiffs argue that no disruption of the trial needed to occur and that evidence relating to mental distress even now can be presented in separate proceedings, I agree with Defendants that the motion must be denied on the ground of untimeliness.

Defendants deny Plaintiffs' charges generally in their Answer, and respond further that certain of Plaintiffs' claims have been previously rejected by the Equal Employment Opportunity Commission or other agencies, and that others are barred or limited by applicable law. Over the course of the trial, Defendants took the position that the representation of women in clerical positions at the Club was not inconsistent with the representation of women across the State of Michigan in such jobs, and that the large amount of paperwork associated with the insurance industry virtually guarantees a heavily clerical work force dominated by women. As to the presence of women in the higher-paying jobs (including supervisory and management personnel), Defendants argue that women are represented in proportions similar to those which appear in the outside work force and that, in fact, women are being hired at rates equal to or greater than their rate of application to these jobs. Defendants contend, finally, that Plaintiffs have produced no evidence that the Club does discriminate against its female employees in the matters of hire, promotion, or compensation, or in any of the other ways suggested in the Complaint.[4]

---

**4.** At the close of Plaintiffs' case, Defendants moved to dismiss the class claims (except for the maternity issue) and all but two of the individual claims and to strike certain testimony on the ground that Plaintiffs had failed to make out a prima facie case of sex discrimination.

These motions were denied from the bench without prejudice because of my belief that claims such as these are ill-suited to dismissal without the benefit of all the evidence from

Trial was commenced on May 15, 1979. Over the course of 46 days of testimony, the parties presented over 70 witnesses. Among them were the named Plaintiffs (except Ora Lee Jasper), other class members and employees of Defendants, various supervisory and management personnel from several departments within the Club, and representatives from the Personnel Department. In addition, Plaintiffs presented the expert testimony of Victor Meyer, instructor and computer systems analyst for Marygrove College, Detroit, Michigan, and the author or programmer of a number of the computer programs involved in the Plaintiffs' statistical case; Dr. John Dwyer, Associate Professor of Mathematics at the University of Detroit, who was responsible for analysis of applicant and new hire data; and Dr. Mark Killingsworth, Assistant Professor of Economics, Rutgers College, New Brunswick, Maryland, and a specialist in labor economics, who performed both conventional statistical analysis of male and female distribution at the Club and a regression analysis of salaries and job grades of some 2,000 randomly selected Club employees.[5]

Defendants similarly offered the testimony of various employees and management personnel in response to the cases presented by the individual Plaintiffs. By way of rebuttal, Defendants also introduced the work of Dr. J. Wanzer Drane, Professor of Mathematical Sciences at Southern Methodist University, and senior statistician for Criterion, Inc., a consulting firm whose work includes analyses of the employment practices of business and other organizations concerned with implementing or defending their affirmative action employment programs. In addition, Dr. Wayne E. Ruhter, Assistant Professor of Economics and Political Economy at the University of Texas at Dallas, and also a consultant with

Criterion, Inc., testified briefly in conjunction with Dr. Drane regarding some aspects of the statistical techniques used by his colleague.

The method of proof in a discrimination case brought under Title VII, described in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), requires Plaintiffs to establish a prima facie case of discrimination before the burden shifts to Defendants to rebut Plaintiffs' evidence or otherwise to justify its treatment of Plaintiffs. If that burden is met, Plaintiffs, can succeed only by showing that the proffered justification was a pretext for unlawful discrimination. *Id.*

While *McDonnell Douglas* involved a claim of disparate treatment, the general framework has been adopted for claims of disparate impact (including class actions). *See, Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *see also, Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). If Plaintiffs are successful in meeting the burden of showing that a particular policy or practice of Defendants has a disparate impact on Plaintiffs' protected group, Defendants must establish that such a practice or policy is justified by its close relation to job requirements, business needs, or some other legal grounds warranting its retention. As in *McDonnell Douglas*, Plaintiffs may ultimately prevail by proving that less harmful alternatives exist.

The claims raised by Plaintiffs, and Defendants' responses, are analyzed in this opinion according to the standards expressed in *McDonnell Douglas* and subsequent cases. By way of background, however, section I contains a breakdown of Defendants' work force into several job categories which aid in establishing the num-

---

both sides. Defendants then renewed these motions at the close of their case. Once again, *these motions are denied, and the issues raised therein are decided in this opinion on their respective merits.*

**5.** Dr. Killingsworth was assisted in the preparation of his regression analyses by Dr. John

Abowd, Visiting Assistant Professor of Econometrics and Industrial Relations, Graduate School of Business, University of Chicago, and also a specialist in labor economics. Dr. Abowd did not testify, however, and Dr. Killingsworth assumed sole responsibility for the entire report.

ber and distribution of women in the Company. Then, in section II, the class of present employees is examined in two parts: first, all statistical evidence relevant to current employees is reviewed; second, lay testimony in support of Plaintiffs' claims of disparate impact and disparate treatment is evaluated in light of the statistical presentation. Section III is devoted to the claims raised on behalf of the applicant class; in section IV, former employees are discussed. In the final section of the opinion, the regression analyses performed by both parties are described and compared briefly.

## I. The Work Force

Between 1974 and 1978,[6] that size of the work force at the Club varied from 3,700 to approximately 4,000 employees. Data regarding the number of employees, as well as both their personal and work histories, is found on certain computer tapes produced by the Company at the end of each calendar year. Annual reports filed by the Club at the request of the Equal Employment Opportunity Commission provide similar data on the make-up of the work force according to job categories developed by the Commission. From both these sources, the following information may be derived.[7]

First, analyzed in accordance with Equal Employment Opportunity Commission directives, the Company, at year-end 1974, employed 3,768 individuals in the following categories.[8]

1974 Work Force by EEOC Categories

| | All Employees | Women (%) |
|---|---|---|
| Officials and Managers | 153 | 0 (0.0%) |
| Professionals | 655 | 69 (10.5%) |
| Technicians | 31 | 0 (0.0%) |
| Sales Workers | 580 | 6 (1.0%) |
| Office and Clerical | 2,261 | 2,209 (97.7%) |
| Operations | 27 | 0 (0.0%) |
| Service Workers | 61 | 38 (62.3%) |
| | 3,768 | 2,322 (61.6%) |

Similar figures for 1978 indicate the major areas of change at the Club within the last five years.

1978 Work Force by EEOC Categories

| | All Employees | Women (%) |
|---|---|---|
| Officials and Managers | 568 | 284 (50.0%) |
| Professionals | 702 | 234 (33.3%) |
| Technicians | 29 | 7 (4.1%) |
| Sales Workers | 658 | 45 (6.8%) |
| Office and Clerical | 1,969 | 1,921 (97.6%) |
| Operations | 19 | 0 (0.0%) |
| Service Workers | 46 | 22 (47.8%) |
| | 3,991 | 2,513 (63.0%) |

In 1975, approximately 100 office supervisors, formerly classified as Clerical employees, were reclassified as Professionals by the Company. Subsequently, in 1978, some number of office and technical supervisors were reclassified as Officials and Managers. The effect of these actions, which were accomplished in apparent compliance with EEOC regulations, has been in part to cause a dramatic increase in the percentage of female employees classified as Officials and Managers.

By comparison, information taken directly from the Company's year-end tapes and broken down by Company-assigned job sequence numbers offers a slightly different view of female representation at the Club.

---

6. As a result of the class certification order, 1974 is the first year for which liability may be assessed, and 1978 is the last year for which complete employment records exist.

7. When both parties have provided competing data concerning Defendants' work force, I have selected Defendants' figures because of their superior access to and responsibility for the personnel files of their own employees. In many areas, however, Plaintiffs have put forth analyses of the work force which have not been answered by Defendants; where useful, I have adopted Plaintiffs' figures.

8. In their Brief in Response to Plaintiffs' Trial Brief, Defendants offered their own revised version of the EEOC reports. Defendants' Brief, 112. In view of the fact that this data was not presented at trial and subjected there to examination by Plaintiffs, I am reluctant to accept these figures. While the percentages of female representation in the various categories are not greatly different, the actual numbers reported are significantly different—for example, Defendants now list a total of 4,681 employees for year-end 1978. For these reasons, I will proceed on the basis of the data cited in the text.

1974 Work Force by Job Sequence Numbers

| | All Employees | Women (%) |
|---|---|---|
| Executive/Administrative (0001–0073; 1200–1230) | 173 | 3 (1.7%) |
| Commissioned Sales (no regular job sequence number) | 588 | 10 (1.7%) |
| Technical Supervisor (0100–0550) | 118 | 3 (2.5%) |
| Clerical Supervisor (1000–1110) | 352 | 343 (97.4%) |
| Professional-Technical (2000–4999) | 600 | 113 (18.8%) |
| Clerical (5000–5999) | 1,682 | 1,669 (99.2%) |
| Non-Clerical (6000 + ) | 250 | 174 (69.6%) |
| | 3,763 | 2,315 (61.5%) |

1978 Work Force by Job Sequence Numbers

| | All Employees | Women (%) |
|---|---|---|
| Executive/Administrative (0001–0073; 1200–1230) | 213 | 13 (6.0%) |
| Commissioned Sales (no regular job sequence number) | 529 | 12 (2.3%) |
| Technical Supervisor (0100–0550) | 137 | 16 (11.7%) |
| Clerical Supervisor (1000–1110) | 392 | 381 (97.2%) |
| Professional-Technical (2000–4999) | 799 | 276 (34.5%) |
| Clerical (5000–5999) | 1,734 | 1,709 (98.6%) |
| Non-Clerical (6000 + ) | 143 | 75 (52.9%) |
| | 3,947 | 2,587 (65.5%) |

Plaintiffs produced a third analysis of the 1978 work force in terms of the broad occupational categories used by the Bureau of the Census. [Plaintiffs' Exhibit 415.] These totals tend to fall between the limits set by the EEOC reports and the Job Sequence Number charts, and thus do not offer much additional assistance at this point, although these figures become more important in subsequent comparisons of Defendants' employee distribution to the outside labor market.

On the whole, I find the classifications based on job sequence numbers more useful than those suggested by the EEOC. The fact that they are Company-generated in a way that the Commission's categories are not carries great weight, as does their apparently greater precision. These figures reflect both the actual positions at the Club and the Club's own view as to which employees hold them. Presumably, a greater homogeneity exists within these categories than may be found in the EEOC classifications to which the Club is obliged by law to adopt its own employment scheme as best it can.

Some general conclusions can be drawn from these figures. First, women have at all times relevant to this suit constituted a clear majority and at no time comprised less than 61.5% of the Club's work force. Second, it is apparent that women in non-supervisory roles are more likely to work in clerical and service worker positions than elsewhere, and that as supervisors they are much more likely to occupy positions of responsibility over clerical employees than others. In effect, women who come to work for Defendants are likely to become clerical employees and to be supervised by other women. As of 1978, for example, nearly 81% of the women employed by Defendants were classified according to their job sequence numbers as either clericals or clerical supervisors, compared to some 87% of Defendants' female work force in those positions in 1974. Even using the relatively understated figures found in the EEOC reports, and limiting the analysis to only those women classified as clerical employees (due to the difficulty of extracting clerical supervisors from the Professionals category), it appears that in 1974 approximately 95% of the women employed by the Club held clerical positions, and in 1978 over 76% were similarly classified.

Third, in the more highly-paid non-clerical positions, male employees easily predominate in proportions much greater than their actual numbers might otherwise suggest. For example, at year-end 1978, males constituted approximately 35% of the Defendants' work force while occupying over 81% of the jobs classified as Professional-Technical, Technical Supervisor, Commissioned Sales, and Executive/Administrative; the same analysis for 1974 indicates that over 91% of those jobs were held by males who otherwise made up 38.5% of the employee population. Similar results can be obtained from the EEOC data: In 1974,

male employees comprised 38.4% of the work force and held over 94% of the higher positions; by 1978, males were still 37% of the force, but were then occupying 71% of these positions.

The figures suggest that the concentration of women at the lower, primarily clerical levels has resulted inevitably in their reduced, though slowly increasing, appearance at the higher levels in the work force. The significance of these generalizations, however, cannot be determined until comparisons are made with the representation of women in similar positions outside the Club.

II. The Class of Present Employees

A.

■ In order to draw conclusions from the distribution of women at the Club from 1974 to date, comparisons must be made between the Club and a suitable labor market. The choice of a relevant labor market involves at least three elements all of which are disputed here—its temporal boundaries, the geographical boundaries of the market, and the size of the market itself with which the employer is to be compared. *See, Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

The time span over which the market is measured is determined by the limits placed on the Plaintiff classes by the certification order and by the limits inherent in the available data. In this case, the relevant time period is the years 1974–1978; the limits of the data are discussed below.

The geographical limits of the labor market generally must bear a reasonable relation to the scope of the employer's business and the area from which it draws applications and employees. *Hazelwood, supra*, at 310–312, 97 S.Ct. at 2743; *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1371 (5th Cir. 1974). Defendants operate a statewide insurance company with much of their activity occurring in various branch offices around the State. Given the fact, too, that Defendants recruit and receive applications from all over Michigan, the relevant geographic limits would appear to be the state boundaries. The issue is whether Plaintiffs are justified in seeking a broader, national market for comparison notwithstanding these facts. Resolution of this question, however, depends on whether general or specific population data is more appropriate in this case.

Where the job skills in question are the kind that "many persons possess or can fairly readily acquire," general population data has proved acceptable. *Hazelwood, supra*, at 308 n.13, 97 S.Ct. at 2742 n.13. *See also, International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1972). On the other hand, "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood, supra*, at 308 n.13, 97 S.Ct. at 2742 n.13. Where the existence of necessary qualifications is not readily apparent, the burden is on Defendants, I believe, to demonstrate that "the positions in fact do require special qualifications not possessed or readily acquired by the general population." *Equal Employment Opportunity Commission v. Radiator Specialty Co.*, 610 F.2d 178, 185 (4th Cir. 1979); *Kaplan v. International Alliance of Theatrical and Stage Employees*, 525 F.2d 1354, 1358 n.1 (9th Cir. 1975); *United States v. Hayes International Corporation*, 456 F.2d 112, 120 (5th Cir. 1972). *Compare, Mayor v. Educational Equality League*, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974).

This dispute over the existence of special qualifications ultimately compels the adoption of the broad or detailed occupational categories developed by the Bureau of the Census. Plaintiffs advocate the use of the broad occupational categories[9] and

---

9. The use of the broad occupational categories, rather than general population data, is warranted by the nature of Plaintiffs' claims. Unlike other discrimination cases, Plaintiffs are not asserting a lack of female representation in the work force as a whole, but only their dispro-

suggest the Current Population Survey of 1977 as an adequate and reasonably up-to-date basis for comparing the distribution of women at the Club with their distribution nationally. Defendants, in contrast, rely on the detailed breakdown of occupations in both the United States and Michigan found only in the 1970 census data. Defendants argue that the broader categories are misleading, principally because each category includes a wide range of occupations that are not found at the Club, and that their inclusion for purposes of comparison seriously distorts the relevant aspects of the female employment picture in Michigan to which Defendants wish to be compared.

In addition, Defendants argue that because the Professional, Technical, and Sales positions in question (usually referred to as PTS positions) require job skills not found in the general population, a true reflection of female availability can best be obtained by reference to the detailed code data. Female availability, as used by Defendants, is the percentage of women in the outside work force who, they believe, are qualified to perform the various jobs existing at the Club, and thus can be considered available for comparison with the percentage of women in these jobs at the Club. These women are qualified, Defendants argue, because they actually held these jobs in 1970 according to the detailed Michigan census data.

I disagree with the use of the data recommended by Defendants on several grounds. First, as a matter of judgment, employment information which is nearly ten years old may not adequately reflect the current distribution of women in the work force, particularly in view of the profound changes in attitudes and practices which have occurred in society and the economy in the past decade. Data such as this must not be used blindly or in a vacuum; the social context from which these figures are drawn is a

crucial factor in determining their relevance to the questions raised in this suit. Furthermore, my conclusion to measure Defendants' conduct by a national rather than state standard finds support when I consider that the advantages of the 1977 Population Survey clearly outweigh the fact that such current figures are not available on a state-by-state basis.

Second, while population comparisons are often necessary and nearly always helpful in determining disparate impact, the results of such analyses should be viewed with caution where the comparisons are being made not to the representation of minorities or women in the general population, but to their representation in the work force. Unlike general population data, employment distribution figures may well reflect social patterns of discrimination against members of protected groups. Little can be achieved, I believe, by comparing the effects of an employer's current practices with data reflecting the employment practices of a decade ago when the practices now complained of were largely unchallenged.

In addition, as Plaintiffs point out, Defendants' suggestion that only 1970 Michigan population data from the narrowest occupational categories relevant to insurance operations be used for these comparisons raises an interesting question. Given Defendants' large widespread work force, it is not inconceivable that significant portions of the data in these detailed categories may reflect Defendants' own employee distribution pattern in 1970. Thus, the use of these figures here may well result in comparing the Company in 1979 to the Company as it existed in 1970; in such a case, results generally favorable to the Company would not be unexpected.

Finally, I disagree with Defendants' assertion that the PTS positions in actual

portionately high numbers at the Company's lower levels and correspondingly low numbers in the higher positions. Thus, the broad categories which presume some degree of qualifica-

tion are more suitable for comparison to the jobs desired by women at the Company than general population data.

dispute require the kind of skills which cannot be found in the general population. *Hazelwood, supra,* 431 U.S. at 308 n.13, 97 S.Ct. at 2742 n.13. Recourse to the 1970 detailed data is unnecessarily misleading to the extent that this approach implies that the best test of current female availability for these positions is the number of Michigan women working in these jobs in 1970. I reach this conclusion for two reasons. First, testimony of Company personnel established the absence of rigorous prerequisites for many of the PTS positions and the widespread use of training programs for new hires into entry-level PTS openings. Second, where the actual qualifications for the positions sought are challenged, as some of them are, reliance on detailed job data such as Defendants offer presumes the validity of the very qualifications under attack. The census job categories are selected by Defendants in an effort to replicate existing job categories at the Club; by doing so, Defendants are in effect applying their job qualifications to the general population and selecting that small portion

which Defendants view as the most suitable. This same process, when applied to female applicants, is attacked by Plaintiffs for its discriminatory effect on women. I do not believe that this allegedly discriminatory process can be adopted on the preliminary basis urged here by Defendants without seriously prejudicing the outcome of this examination.

For these reasons, I find that none of the positions in question here requires any skills that cannot be found in, or easily acquired by, the population in general and female workers in particular, and that the use of broad occupational categories is required in this setting.

As a glance at the work force comparisons will show [Plaintiffs' Exhibit 415, reproduced *infra*], the practical effect of the determination to use the newer data is small inasmuch as Defendants' 1977 female distribution figures with respect to PTS-comparable occupations are well below both national and state figures from 1970 and 1977.[10]

---

**10.** Plaintiffs' Exhibit 443 indicates that these differences are all statistically significant with the possible exceptions of the Professional, Technical, and kindred percentages for the United States and Michigan in 1970.

CHART 22

SEX COMPOSITION OF EMPLOYMENT BY MAJOR OCCUPATIONAL CATEGORY, US,
MICHIGAN AND AAA, 1970 and 1977

| | 1970 Census | | | | Current Population Survey—US, 1977 | | AAA—12/31/77 * | |
| | Michigan—employed persons 16 & over | | US—employed persons 16 & over | | US—employed persons 16 & over | | Employed Persons | |
| | No. | % Female | No.** | % Female | No.** | % Female | No. | % Female |
|---|---|---|---|---|---|---|---|---|
| Professional, Technical, and Kindred | 461,892 | 38.3 | 11,351 | 40.1 | 13,692 | 42.6 | 255 | 32.9 |
| Managers & Administrative | 227,381 | 15.6 | 6,371 | 16.6 | 9,662 | 22.3 | 352 | 8.8 |
| Sales | 220,680 | 42.9 | 5,445 | 39.3 | 5,728 | 43.3 | 610 | 4.8 |
| Clerical | 550,123 | 74.5 | 13,748 | 73.5 | 16,106 | 78.9 | 2638 | 86.7 |
| Craft | 499,814 | 4.1 | 10,610 | 4.9 | 11,881 | 5.0 | 6 | 16.7 |
| Operatives, except Transport | 571,205 | 25.5 | 10,499 | 38.2 | 10,354 | 39.6 | 1 | .0 |
| Transport Operatives | 124,626 | 6.7 | 2,958 | 4.5 | 3,476 | 6.8 | 31 | 0 |
| Non-Farm Laborers | 130,963 | 9.0 | 3,431 | 8.3 | 4,500 | 9.4 | 0 | 0 |
| Service | 386,857 | 58.1 | 8,627 | 55.2 | 11,234 | 58.3 | 44 | 59.1 |

PREPARED BY: Dr. Killingsorth
SOURCE: Census data, year-end tapes
METHOD: Direct extraction from governmental reports.

\* All employees, with the exception of 51 persons whose job titles could not be categorized accurately without further information from defendants.
\*\* Figures in thousands.
Note: This chart was identified as Table 2 in Plaintiffs' January 4, 1979 Answers to Interrogatories.

Moreover, Defendants' 1977 female clerical representation stands a good deal higher than comparable figures on the state or national level in either year. These comparisons appear to support the inferences drawn from the earlier examination of the Company on its own terms with respect to the distribution of its female employees.

But the impact of the newer data is felt most obviously with respect to Defendants' extensive reliance on the detailed census codes for a wide variety of comparisons. For example, by comparing the number of women employed as computer programmers in Michigan in 1970 with the total number of programmers in the State at that time, Defendants arrive at a percentage of "female availability." [Defendants' Exhibit 852.] That percentage is then used as the standard to which the current percentage of female programmers at the Company is compared. Elsewhere, the figures for a variety of related detailed occupations are combined and a weighted average of "female availability" produced for comparisons within broader employment categories such as those adopted by the EEOC. [Defendants' Exhibit 852.] On the basis of these kinds of comparisons, Defendants argue that with some exceptions (notably Sales) they employ (or hire) women in statistical proportion to their presence in the Michigan labor market.

Rather than repeat my reasons for disapproving this approach, I note only that Defendants' suggested analysis has the inevitable effect of dividing the Company into a great number of discrete units to be examined and judged separately. While under some circumstances this method may be helpful, I believe that, where the Company's entire employment structure is being challenged, continuous reference to the

overall picture is required in order to place this more specific data in proper context. I find, when comparing Defendants' employment and classification of women to more recent national figures, that women are systematically underrepresented in the PTS positions and somewhat overrepresented in the clerical field.

In addition to the population comparisons, Plaintiffs produced several other studies of the Company, which are intended to show the contrast between the actual and expected distribution of women by salary grade at year-end 1978. [Plaintiffs' Exhibits 409, 410.] "Expected distribution" in this respect reflects Plaintiffs' conclusions about the salary grade which female employees would have achieved at year-end 1978 if they had been treated as male employees who shared their salary grade in 1976.[11] This relatively simple analysis is based on the assumption that men and women in the same pay grade in 1976 should have essentially the same employment experience over the next two years on average and thus should be proportionately distributed throughout the salary range. As Plaintiffs' own expert noted [Tr. 2782–84], the analysis has several flaws, including the lack of any role for the relevant performance characteristics of employees and the fact that placement in salary grade in 1976 is as much a result of Company policies as the process under examination. Nonetheless, the charts do indicate that *as a group* female employees are not being assigned to salary grades in the same way as male employees, and that *as a group* fewer women occupied the higher salary grades in 1978 than the distribution of male employees sharing the same grades in 1976 would indicate.

A similar analysis was performed with reference to the Club's various occupations, categorized by job sequence number, relating to the positions held by Defendants' employees in 1973, as well as employees hired after 1973, and calculating the expected distribution of females, assuming equal treatment as defined for these purposes. [Plaintiffs' Exhibit 412; Tr. 2799–2818.] In general, the chart demonstrates that equal treatment would have resulted in greatly increased female representation in the Technical Supervisor, Professional-Technical, Commissioned and Salaried Sales, and Executive/Administrative positions, and reduced representation in Clerical Supervisor and other clerical positions. Again, the disabilities of the previous studies are present here as well.

Finally, Plaintiffs presented two studies of wages based on data in the Company's year-end tapes—one of which revealed that since 1974, the mean weekly salary of males has exceeded that of females by $120–$130,[12] and another which calculated the earnings "advantage" to male employees compared to female employees of comparable age and tenure at the Company.[13] Based on salary data from 1976 to 1978, it appears that the percentage weekly advantage to males in each of the three years was at least 60%, or approximately $210–$295 per week, when all of the employees in each of those years is compared.

As with the other statistical evidence presented, I find these results indicative of a continuing pattern of treatment, and

---

**11.** The studies are limited to the years 1976–1978 because the grading system now employed at the Club was installed in 1976; prior to that time, salary classifications were constructed differently and are not easily matched with the present scheme.

Plaintiffs' Exhibit 409 is a study of all women occupying salary grades 1–14 at year-end 1976 and calculates their expected distribution on the basis of the experience of men who occupied that same salary grade in 1976 and who were promoted, demoted, transferred, or unchanged two years later. Due to the possibility that relatively low numbers of males in grades

1–5 and low numbers of females in grades 11–14 might skew the final results, Plaintiffs' Exhibit 410 takes this same approach with those men and women who were in salary grades 6–10 in 1976.

**12.** The mean weekly salary figures did not include the salaries of approximately 150, predominantly male, management employees of the Club.

**13.** A more elaborate study along similar lines is discussed *infra*.

while these results must be read in context with the parties' other evidence on these points, the implication of discrimination arising from the overall Company employment statistics are generally borne out by these more specific analyses of various aspects of Company practice.

### B.

Plaintiffs allege that a wide variety of Company policies have had, and continue to have, a disparate impact on the employment opportunities of its female employees. In particular, Plaintiffs cite the Defendants' failure to post job openings adequately prior to 1978, and otherwise to inform employees adequately of openings in various departments; the use of non-validated job requirements and descriptions; Defendants' acquiescence in the exercise of hiring discretion by department managers who are, for the most part, male; and the use of quotas to reduce the potential representation of women in certain PTS positions once applications from female employees exceeded certain levels.

### 1. Job Descriptions and Evaluations

During the course of testimony, representatives of the Club stated that in 1973 and 1974 the first steps were taken to evaluate all the jobs at the Company in an attempt to create a consistent schedule of compensation. [Tr. 145.][14] After a period of transition lasting until 1976, the evaluations were completed, and jobs were redefined and then assigned to a scale of salary grades.

The process of describing and evaluating various positions at the Club does not appear to have been vigorous. In most cases (at least until 1978), the basic job description was formulated by the department manager (or his delegate) under whose supervision the job was then performed. [Tr. 155–157, 295, 342.] The description was then forwarded to the Personnel Department where a wage and salary analyst would review the description, classify it according to the duties and functions described, and then submit the description to a review committee for approval of the proposed grade assignment. [Tr. 295–296.] Until the process was changed in 1978, the analyst did not verify the description by making an on-site inspection of the employee who actually performed the job. [Tr. 341; see, e. g., Tr. 648–650.] Testimony was given to the effect that the former procedure was flawed insofar as it created the possibility of inconsistent descriptions, over- or under-inflation of job duties or requirements, and was associated with a lack of employee awareness of the evaluation procedure [Tr. 342], notwithstanding the fact that the original job description should have been signed by the employee. [Tr. 295.] Finally, the evaluation criteria actually employed by Defendants were not developed by professional consultants, but rather adapted from a commercially available method of job analysis from which Defendants borrowed what they believed to be pertinent to their needs. [Tr. 289.]

In addition, the Employment Administrator of the Personnel Department stated that, with the possible exception of a few secretarial tests given to clerical applicants [Tr. 410], no other test or job requirement for any position at the Club has ever been validated in accordance with federal or other applicable guidelines. [Tr. 410, 441–445; see also, Plaintiffs' Exhibit 23, p. 3.] See, e. g., 20 C.F.R. § 1607 (Uniform Guidelines on Employee Selection Procedures) (1978). In fact, the closest that Defendants appear to have come to an examination of job requirements are some informal studies conducted in an effort to determine work experience equivalents to educational requirements. [Tr. 411.] Other requirements, such as prior experience in particular jobs at the Club, seem merely to have developed over time because they appeared to be de-

---

**14.** All citations to the Trial Transcript are intended primarily as points of reference rather than the exclusive source of support for the statements and findings in this opinion. As in all cases, my findings and conclusions are based on the cumulative weight of all the evidence and my determinations concerning the credibility of witnesses.

sirable [Tr. 3723] or sound personnel practice. [Tr. 410–411, 441–445, 3450.] [15]

The prior experience requirements, in particular, have a direct effect on the success of women applicants for certain positions. Testimony established that one of the job requirements for assistant branch manager, for instance, was prior experience in claims, which, until recently, had been a predominantly male field. As a result, no women were eligible for the assistant manager's position because of their historic inability to obtain the requisite claims background. [Tr. 453–454.] In 1978, however, the first woman was promoted to an assistant branch manager's job soon after the Company centralized the claims work in some regions, thus creating a few branches in which claims work was no longer done. [Tr. *1127–30.] [16] Although Defendants assert that claims experience prior to 1978 was required because the assistant manager was "responsible" for all claims work, the Company's Employment Administrator acknowledged that the requirement had never been validated. [Tr. 480.] Defendants did not explain why prior experience in another major branch activity—clerical and office supervision—in which women traditionally had a solid background was not considered

a qualification for the assistant manager's position.[17]

In short, Plaintiffs claim that the jobs they now seek continue to be held beyond their grasp because of prior experience requirements—that is, prior experience in related PTS positions from which they have traditionally been excluded.

The obligation of the employer stemming from Title VII is well-established. In holding Title VII violated by the use of a high school diploma requirement which disproportionately excluded blacks, the United States Supreme Court stated:

> Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory practices.

> •     •     •     •     •

> Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.

*Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 432, 91 S.Ct. 849, 853, 854, 28 L.Ed.2d

---

**15.** Defendants argue that validation is not required for any but "pencil-and-paper" tests, citing B. Schlei and P. Grossman, *Employment Discrimination Law*, 181 (1976). *But compare*, 29 C.F.R. § 1607.16Q ("Selection procedure" defined as "Any measure, combination of measures, or procedures used as a basis for any employment decision," including "traditional paper and pencil tests, . . . and physical, educational, and work experience requirements. . . .")

In any case, as the authors Schlei and Grossman suggest in the cited excerpt, "the utilization of such criteria will withstand attack *if structured in a professional manner to predict job capabilities* to the extent practically feasible within the limits of our knowledge about selection procedures." Schlei and Grossman, *supra*, at 181. (Emphasis supplied.) There is no suggestion on this record that Defendants have approached the task of structuring their job requirements at all, nor have they sought professional assistance in doing so.

**16.** Citations to the transcript [Tr.] which are preceded by an asterisk (*) refer to testimony taken after October 10, 1979, on which date the

page numbers of the daily transcript were renumbered starting at 1.

**17.** Plaintiffs suggest, by way of contrast, that prior departmental experience has worked *against* women with experience in the predominantly female Member and Policyholders Service Department. The manager of that department, Richard Daher, testified that, despite the fact that his female supervisors possessed the necessary qualifications, the post of general supervisor was consistently filled by males from outside the department until a woman with 20 years' experience in the department was finally promoted in January, 1979. *See*, Tr. 353–359, 380–381. This paradox apparently is not easily resolved:

> "When you advertise a job, any job, meeting the qualifications does not necessarily mean you can do the job. As I answered the question, yes, they [the female supervisors] were all qualified, but in my mind they couldn't do the job." Tr. 385 (testimony of Richard Daher).

158 (1971) (emphasis in the original). Further explanation of this burden is found in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1976), where the Court stated that the employer's obligation to show the job-relatedness of the disputed requirement would arise only after the plaintiff had shown that imposition of the requirement had a disparate impact on the protected group. *Id.*, at 425, 95 S.Ct. at 2375. The employer's successful presentation would then require the plaintiff to demonstrate an equally efficient, less offensive alternative—i. e., demonstrate that the disputed requirement was a pretext for discrimination—in order to prevail. *Id.*

Finally, in *Washington v. Davis*, 426 U.S. 229, 246, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976), the Court noted:

> Under Title VII, Congress provided that when hiring and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved, and that *it is an insufficient response to demonstrate some rational basis for the challenged practices.* It is necessary, in addition, that they be 'validated' in terms of job performance in any one of several ways . . . . (Emphasis added.)

Plaintiffs have introduced statistical evidence relating to the underrepresentation of women in PTS positions and supplemented that evidence with the specific testimony of various employees who claim to have been adversely affected by experience requirements and other, non-validated job qualifications. In addition, Plaintiffs established the existence of various Company policies and practices with respect to job evaluations and descriptions, which are a crucial link in maintaining an equitable compensation schedule and providing an employee with a guide to promotion and greater achievement within the Club. I find that this evidence is sufficient at least to shift the burden to Defendants to explain the "manifest relationship" each job requirement bears to the positions discussed in testimony. *See, Patterson v. American Tobacco Co.*, 535 F.2d 257, 263 (4th Cir.

1976); *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1191–93 (5th Cir. 1976); *Afro-American Patrolmen's League v. Duck*, 503 F.2d 294, 300–301 (6th Cir. 1974); *Spurlock v. United Air Lines, Inc.*, 475 F.2d 216, 218 (10th Cir. 1972).

This they did not do. Confirmation of this conclusion is found, I believe, in the absence of validated job requirements. I conclude, therefore, that the practices alleged—the lack of a systematic job description and evaluation system and the absence of validated job requirements—have a disparate impact on the Company's female employees and have not been justified by their relation to the Company's business needs or the efficient performance of the job.

### 2. Job Posting

Despite a policy of filling job openings with candidates from the Company's work force [Plaintiffs' Exhibit 18], evidence in the record tends to show that the general posting of job openings for the benefit of all employees did not occur until 1976 and later [Defendants' Exhibits 888, 889], although postings for specific positions occurred in an unsystematic fashion during 1973 [Tr. 146] and possibly 1970. [Tr. 274.] While it appears that employees were often aware of openings within their departments, the lack of an official posting policy may have tended to isolate employees in certain departments from knowledge of openings in another. Prior to the spread of job postings, and for all currently non-posted job openings as well, the female applicant who became aware of the opening or simply desired to apply for another position was required to submit her resume to the Personnel Department or, in other cases, to approach her immediate supervisor with the transfer request. [Tr. 210.]

Such informal procedures have been criticized, especially where the supervisor or foreman is in a position to exercise his discretion and refuse to refer the request to Personnel or the other department. *See, e. g., Senter v. General Motors Corporation*, 532 F.2d 511, 528–529 (6th Cir. 1976); *Rowe v. General Motors Corporation*, 457 F.2d 348, 359 (5th Cir. 1972).

[P]romotion [and] transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination . . . . *Rowe, supra*, at 359.

That situation is easily exacerbated when the position desired is not one of those traditionally held by members of the applicant's class, and her failure thus reinforces the general belief that certain jobs are simply not available to women. That phenomenon was illustrated in part by the surge of female applicants for positions in Defendants' sales, claims, and underwriting training classes once those largely male positions were regularly posted throughout the Company and a more formal process of application and selection prevailed. [Tr. *1086–96.]

Two other aspects of the posting policy are possible sources of discriminatory impact. Notwithstanding the general rule requiring the posting of job openings, department managers may request that certain positions not be posted for "good business reasons." [Tr. 139.] The record shows that this technique has been used to preserve certain openings for specific candidates, although the record cannot adequately support a determination as to the advantage, if any, enjoyed by either male or female employees as a result. [Tr. 195–197, 3468, *1031.] And, it is still the case that openings at the assistant manager level and higher are not customarily the subject of job postings. [Tr. 147.] The practice appears most justifiable with respect to high-level management positions and most troublesome when applied to lower-ranking positions at the Club. The position of assistant manager, for example, should be reasonably accessible to a wide range of Company employees, but the failure to post these positions as a rule may easily have a negative effect on would-be applicants. In addition, the practice may tend to reinforce traditional routes to promotion and traditional views as to the appropriate occupants of those jobs, thereby continuing the exclusion of non-traditional candidates. Informal application procedures and dependence on the good will of an immediate supervisor unquestionably can discourage or prevent altogether the entrance of women into previously male jobs. *Senter, supra; Rowe, supra.* This consequence becomes even more important when women are thereby prevented from entering the track which leads naturally to higher level management.

The Company has not, for the most part, controverted this evidence; it seems plain from the record that, while posting occurred in the early 1970's, the system was not "sophisticated" [Tr. 154], and did not become so until the middle 1970's when the job evaluation program was nearing completion. Under these circumstances, I find that the lack of adequate posting through 1974 and 1975 in conjunction with the employment practices described earlier contributed significantly to the impairment of Plaintiffs' employment opportunities.

### 3. Reliance on Managerial Discretion

The role played by the department manager in the selection process is substantial. For example, in addition to writing the actual job descriptions (which naturally determine the range of employees who are deemed eligible for the post), the manager is responsible for the final selection of the employee who will fill an opening in his department. [Tr. 278, 336, 401; *cf.* 190. *See also*, Plaintiffs' Exhibits 18, 341.] While there is some indication that the Personnel Department attempted to monitor the manager's selections and curb those which violated certain affirmative action expectations [Tr. 190], those occasions were rare and the independence of the department heads in this area is not seriously challenged. Further, with respect to the positions of assistant manager and above, Personnel Department input is either limited—only an occasional assistant managership is filled through the Department—or non-existent because these selections are customarily made by top management without benefit of posting or other regular Personnel Department procedures. [Tr. 108, 110, 147.] While these practices themselves have a significant effect on the advance-

ment opportunities afforded female employees, Plaintiffs presented additional testimony concerning the unfavorable attitudes held by some of the department managers and supervisors on whose judgment the selection process is based. [*See,* discussion of affirmative action, section II.C., *infra.*]

As noted earlier, the exercise of this kind of discretion by a managerial class in which the protected group is not well represented easily permits the continued exclusion of that group's members as a result of the manager's or supervisor's subjective evaluation. "Absolute discretion over employment decisions where subjective . . . prejudice may control (perhaps even without the executive's knowledge) is no longer consistent with our law." *Abrams v. Johnson,* 534 F.2d 1226, 1231 (6th Cir. 1976); *Senter v. General Motors Corporation, supra; Rowe v. General Motors Corporation, supra; see also, Cosby v. United States,* 472 F.Supp. 547, 552 (S.D.Ohio 1979).

On the basis of this evidence and Plaintiffs' statistics concerning overall representation, I find that Defendants' policy of vesting their managers with a large degree of unsupervised discretion in the matter of personnel selection has had, in line with the other aspects of Defendants' employment practices, an adverse impact on the women at the Club. Other than the brief references to Personnel Department "input" and a possible "veto" capability, Defendants did not present evidence that this is not in fact their practice, nor did they produce any evidence that the practice is required as a matter of business necessity. Therefore, I conclude here as well that Plaintiffs have shown the discriminatory effect of Defendants' employment procedures.

### 4. Quotas

Plaintiffs allege, on the basis of certain testimony and statistical data [*see,* Tr. *1085, *1136; Plaintiffs' Post-Trial Brief, pp. 17–20], that following the sharp increase in internal applications by female employees for newly-posted sales, claims, and underwriting positions [Tr. *1086–96], Defendants began setting quotas for female

representation in certain positions and going to the outside for male hires. In view of the equivocal nature of this evidence— Defendants, for example, claim that the percentage figures discussed were in fact *minimum* female recruitment goals—I am unable to draw any conclusions from the record concerning the establishment of quotas or their impact on internal female applicants. Moreover, in view of my treatment of Defendants' other employment practices, I do not believe a resolution of this issue is necessary.

### 5. Conclusion

■ After reviewing the statistical evidence presented in support of Plaintiffs' claims of disparate impact, and considering Defendants' response, I conclude that Defendants have maintained policies and practices which have a disparate impact on female employees. Defendants have repeatedly contended that, if such a disparity exists, it is the result of women's failure to apply for the positions they now desire. I do not find that response compelling. "The standard of this Circuit under Title VII is that females must have *equal employment opportunities,* not merely that their applications, if any, be processed fairly." *Mitchell v. Mid-Continent Spring Co. of Kentucky,* 583 F.2d 275, 281 (6th Cir. 1978). In any case, there is considerable statistical and testimonial evidence on this record that women did in fact apply for these positions and were notably unsuccessful in their efforts.

### C.

Unlike the earlier emphasis on the impact of Defendants' practices, the issues raised here—concerning wages, promotions and transfers, maternity terminations, and affirmative action—generally involve the disparate manner in which the Company treats its female employees. Indeed, aside from some broad statistics relating to average salaries and promotional success, Plaintiffs' evidence consists of the testimony of several female employees about their work experiences at the Company. Defendants concentrated on meeting the testimony of each

witness and offering alternate versions of the events or policies in question.

█ In contrast to the analysis of the parties' burdens used in deciding the issue of disparate impact, the law requires that, where disparate treatment is alleged, a prima facie case must show "actions taken by the employer from which we can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Construction Corporation v. United States,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1979), citing *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). In particular, where Plaintiffs allege discrimination in hiring or promotion, any prima facie case must contain these elements of proof: membership in a protected group; application for an opening for which the plaintiff is qualified; rejection; and, following rejection, the employer's continued search for applicants as qualified as the plaintiff. *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted).

If Plaintiffs succeed in establishing a prima facie case, the employer is then faced with the task of "proving that he based his employment decision on a legitimate consideration, and not an illegitimate one . . ." *Furnco, supra,* 438 U.S., at 577, 98 S.Ct., at 2950. In other words, the employer must "'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.,* at 578, 98 S.Ct., at 2950 (citing *McDonnell Douglas, supra,* 411 U.S., at 802, 93 S.Ct., at 1824).[18]

If the employer can do so, Plaintiffs must prove that the employer's justification is in fact a pretext for discrimination, *McDonnell Douglas, supra,* at 804–805, 93 S.Ct. at 1825, or face rejection of their claim of discrimination.

The following discussion deals with each of Plaintiffs' allegations of disparate treatment. The Company's affirmative action policy and its implementation on behalf of women, the Club's promotion and transfer policy, its treatment of women with respect to wages, and its maternity termination policy are examined separately in accordance with the analysis set out above.

### 1. Affirmative Action

█ A profitable examination of Defendants' treatment of its female employees cannot be made without simultaneously exploring the attitudes and behavior of the male managers and supervisors who are largely responsible for these employment decisions. In view of the fact that intent to discriminate is an issue in this portion of the case, I believe that statements by managerial personnel about the affirmative action policy are helpful as a means of establishing the context in which their actions took place.

18. Defendants spend some time discussing the distinctions between the burden of "proving" and that of "articulating," particularly as that question is addressed in *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam). I do not believe that there is much value in parsing such distinctions, if they indeed exist, nor do I believe that this issue is presented in this case. As I understand the per curiam opinion, the real distinction drawn there is between the *articulation of a nondiscriminatory reason* for the rejection and *proof of the absence of a discriminatory motive. Id.,* at 25, 99 S.Ct. at 295. To the extent that the lower court placed the burden on the employer of proving a negative, the Court appears to reject that approach in favor of the less onerous, positive burden. In such a context, the difference between "articulations" and "proofs" are not material, and I do not believe they describe any change in the manner in which Defendants are obliged to place their case on this record.

In conclusion, I see no basis either in the Court's opinion or in reason itself for Defendants' assertion that *Furnco* or *Board of Trustees* have limited the scope of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Griggs,* of course, concerned the analysis of the appropriate burdens borne by the parties in a case of disparate impact, not treatment—a point which *Furnco* makes quite clear. *Furnco, supra,* at 575 n.7, 98 S.Ct. at 2948 n.7; *see also, id.,* at 583, 98 S.Ct. at 2952. (Marshall, J., concurring and dissenting). *Compare, Hernandez v. Alexander,* 607 F.2d 920, 922–923 (10th Cir. 1979).

An affirmative action policy and program was adopted by the Club in 1971 following a series of meetings between Club officials and the Detroit Commission on Community Relations. [Tr. 396–397, 272–273.] The policy itself recites the Company's aim to "recruit and lure the best qualified personnel in all our locations and to provide equal opportunity for the advancement of all employees, including training, promotion, and upgrading in a manner which will not discriminate against them because of race, color, creed, age, sex, or national origin." [Plaintiffs' Exhibit 23.]

Despite the document's reference to discrimination on account of sex, it appears from a fair reading of the testimony in this case that a number of managers and other hiring personnel understood the policy's focus to be on the hiring and promotion of racial minorities, principally blacks. [*See*, Tr. 272–273, 3857, *33–*34, *226–*229, *377.] That conclusion is supported by the policy itself which addresses the issue of sex discrimination specifically only once with respect to the placing of job advertisements. [Plaintiffs' Exhibit 23, p. 2.]

Linked to this seeming lack of emphasis on the Company's treatment of women is the ambiguous response of some of Defendants' managerial employees to the program. In most cases, it appears, hiring personnel were not given any significant direction as to the manner in which the policy was to be implemented on behalf of women in their departments. [*See, e. g.*, Tr. 3525, 3742–43, 3846–48, *39–*40, *379.] Even in areas of the Company in which females were practically nonexistent (computer operations, for instance), no initiatives were undertaken by the Personnel Department or departmental management to investigate such situations.

For example, Gilbert Kreutzer, manager of data processing until 1975, "saw no reason to take action" concerning the absence of women in the computer room. [Tr. 3572.] On the other hand, Charles Cone, former group manager with overall supervisory responsibility for computer operations, described his objectives under the affirmative action policy as "attempting to be sure that my managers took every opportunity to look for females, and in the case of race, of black people or minorities to be hired." [Tr. 3668.] But further positive steps concerning Carolyn Madden Hall and the computer operator position she sought, for example, were not taken because, Cone stated, he "assumed" that the alternatives had already been explored with her. [Tr. 3670–71.]

In general, it appears that the affirmative action policy was not implemented on behalf of women in an active fashion—*e. g.*, seeking out promotable females in the Company whether they had applied or not, or training interested women specifically to meet job qualifications. Rather, the policy served merely to remind managers and other hiring personnel that if a qualified female applied for the position, she must be considered fairly. [Tr. 226–229, 3848.] As Cone noted, "Before an affirmative action plan can work or the policy will work, there has to be qualified applicants . . . if there is no applicant, we can't hire." [Tr. 3676.] But Cone's reliance on his managers' awareness of the affirmative action policy to bring qualified female applicants to his attention [Tr. 3877] places the burden squarely on the shoulders of his subordinates, including James Stevenson and Glenn Fritsch in computer operations, who noted that "We really didn't take very many [affirmative steps]." [Tr. 3857.]

This ambivalence is not confined to the Data Processing Department. In discussing the manner in which he selected general supervisors for the Auto Processing Department, Manager Richard Daher stated that, although aware of the policy, affirmative action was not taken into consideration [Tr. 381], a statement which helps explain the regular rejection of female applicants for that position.

The attitudes of influential Company personnel and their interpretation of their obligations under the affirmative action policy are important to the extent that they place actual management decisions affecting women in proper context. In cases where disparate treatment is alleged, evidence of

management attitudes about affirmative action is helpful, I believe, in drawing inferences of discriminatory intent or motivation. I have discussed the testimony related here with that purpose in mind, and have used this material to 'the extent it sheds light on the individual claims discussed below.

### 2. Promotions and Transfers

Plaintiffs have introduced some statistical evidence concerning the rate of promotion and transfer for female employees into better-paying positions at the Company [*see, e. g.*, Plaintiffs' Exhibit 338—Openings Filled by AAA Employees 1974–1978 By Promotion, Transfers or Demotion], which, they argue, establishes their basic claim that during the years relevant to this case, male employees were disproportionately successful in obtaining better positions within the Company. *See, Davis v. Califano*, 613 F.2d 957, 960–961 (D.C.Cir.1979). Further evidence of this pattern is found in the individual case histories described from the stand by a number of present and former female employees of the Club and, in particular, Carolyn Madden Hall and Carol Greenspan.[19]

#### a. Carolyn Madden Hall

Carolyn Madden Hall was hired by the Club as a tabulating clerk in 1965 [Plaintiffs' Exhibit 75; Tr. 589] and became a tape and disc librarian in the Data Processing Department in 1969. [Plaintiffs' Exhibit 75; Tr. 591–2.] Hall remained in that position until 1975 when she was transferred into Systems and Programming as a systems trainee [*Id.*], before becoming a regular programmer in Systems a year later. [*Id.*] Hall left the Company in 1976 in order to pursue other opportunities in the computer field. [Plaintiffs' Exhibit 75; Tr. 886–87.]

The tape librarian is responsible for the storage and maintenance of the Company's computer tapes. The tape librarian's work area is immediately adjacent to the computer room itself, and a librarian typically has a constant view of and access to the room and the employees working there. In essence, the job requires selecting the proper tapes needed to make particular computer runs as requested, transporting the tapes within the immediate area, and keeping track of those tapes which have been loaned out. [Tr. 538.] As Hall's testimony and that of other employees established, most of the individuals hired into the tape librarian position moved into the computer room as operators, usually within months. [Tr. 596–597, 718, 3637–40.]

After one year as a librarian, Hall testified, she considered herself qualified to become a computer operator based on her observation and knowledge of the skills and experience possessed by those she saw enter the job. [Tr. 806.] Nonetheless, she apparently made no overtures to her supervisors regarding the computer operator position until sometime in 1972 and thereafter. [Tr. 720–732.] She claims these conversations took place with Glenn Fritsch, then assistant manager in Data Processing, Gilbert Kreutzer, then manager of Data Processing, and Albert Van de Velde, her immediate supervisor at the time. The last of her attempts to enter the computer room took place in 1975 at the time her job was reevaluated and she realized that her current salary placed her at the ceiling for her grade. [Tr. 728, 751.] That effort, like others, was unsuccessful.

In June, 1975, Hall was given the job of trainee in the Systems Department [Plaintiffs' Exhibit 75; Tr. 739], shortly after she had filed a discrimination complaint with the Equal Employment Opportunity Commission. [Tr. 739.] Factors affecting her

---

**19.** In addition to the Greenspan and Hall claims, Plaintiffs presented evidence concerning the unsuccessful attempts of other female employees to obtain desired promotions or transfers and, in most cases, the subsequent promotion of males into those jobs. In particular, the claims of Linda Iler Gibson, Claudia West, Sandra Sauters, Laurel McKenzie, and

Katherine O'Neil were discussed at some length. I do not believe that specific treatment of each claim is required in view of their membership in the classes represented by the named Plaintiffs whose claims are discussed. Nonetheless, I have drawn liberally from their experiences in formulating my conclusions in this area.

decision to file included the results of the job reevaluation, her failure to obtain the operator's job, and the fact that a male employee hired after she had become a tape librarian moved through the computer room and systems area and returned as her supervisor within a five-year span. [Tr. 746, 866; see also, Tr. 3868–3870, 3873–3874.] According to Hall, the systems job came to her as a result of her filing the complaint.[20] [Tr. 816.] After her training in systems was completed, Hall became a programmer, a position which she held until her termination.

The computer operator position which Carolyn Madden Hall desired was almost exclusively occupied by males. The first female operator was Gwendolyn Bronsing McMichael, who was hired in 1968 and moved to programming two years later. [Tr. 617.] After her departure in 1970, no female was hired as a computer operator until 1977, when Pamela Beyst and Mary Aronson were added to the staff. [Plaintiffs' Exhibit 383.] Subsequently, two women were hired in 1978, and an additional woman as of the time of trial in 1979. [Tr. 3478.] In addition to the women hired, evidence was offered concerning the unsuccessful inquiries made by Juanita Sailor and Arquita Thomas—two other female Club employees—about the computer operator position. [Tr. 623–627, 904–906.]

At the time in question, the persons directly responsible for hiring in the computer room were Glenn Fritsch and James Stevenson. Both of them testified, however, that neither Carolyn Hall nor any qualified female (including Sailor and Thomas) even applied for the position between 1969 and 1977.[21] [Tr. 3431–3433, 3445, 3448–53, 3750–51, 3776.] Furthermore, both men admitted that at one point in time, they had had "apprehensions" about hiring women for the computer room [Tr. 3455, 3760] due in part to their concern about women's ability to lift boxes of computer cards, their willingness to work afternoon or midnight shifts, and their personal safety at night during the time Company headquarters was located in downtown Detroit. [Tr. 3761.] Stevenson also suggested that his qualms regarding female computer operators arose out of his experience with Gwendolyn McMichael who "had not worked out well" [Tr. 3455], notwithstanding his earlier comment that she was a satisfactory employee and that he had written a recommendation to that effect on her behalf when she left computer operations in 1970. [Tr. 3361–63.] In any case, both also testified that their misgivings had been settled either by McMichael's performance [Fritsch, Tr. 3762] or the performance of subsequent women in the post. [Stevenson, Tr. 3458–59.]

The attitude of these men is important in light of the way in which promotions into the computer room occurred prior to the installation of uniform posting and application procedures. Hall testified that each of the males who became tape librarians during her tenure there passed after a few months or, at most, a year into the computer operator post. [Tr. 596–597, 714, 718; Plaintiffs' Exhibit 383.] That progression depended on the librarian's awareness of an opening and willingness to make a verbal application to the immediate supervisor or

**20.** Charles Cone characterized Hall's complaint as being "utterly ridiculous" because she had been transferred to systems which he considered to be the next stop beyond computer operations. [Tr. 3674.] As a result, he did not investigate further because "as far as I was concerned, she had no basis for the complaint." [Tr. 3675.] Cone also admitted that he had never talked with Hall in order to ascertain her career interests [Tr. 3665]; in his view, such contacts are the responsibility of her manager and supervisor, who, he assumed, had explored various alternatives with her. [Tr. 3665, 3671.]

**21.** Although Sailor never asked about the position, according to Stevenson and Fritsch, they stated that the position was offered to her in 1977 or 1978 at the direction of higher management. [Tr. 3431, 3771–78.] Despite the fact that the offer was intended to provide Sailor with the technical experience she would need to progress beyond her teleprocessing position and thus further her career [Tr. 3441], Fritsch acknowledged that he had not discussed Sailor's career goals with her prior to this development. [Tr. 3806.] The plan failed in any case due primarily to an inability to come to terms with the Personnel Department regarding salary. [Tr. 3433.]

to Fritsch or Stevenson. [Tr. 723–724, 3519, 3637–40.] If the opening had not been filled, and the individual met the current qualifications, then that person could be hired directly by the Department without any need for the filing of a resume with Personnel. [Tr. 3519.]

As noted, Hall described her efforts to obtain the job which she repeated four or five times at intervals throughout her tenure in data processing. Although Stevenson and Fritsch deny that they had any conversations with Hall concerning her interest in the computer room, I find her testimony sufficient to conclude that she did apply in an appropriate manner for the position. The fact that she was qualified for the job, according to the requirements then applicable, has not been questioned by Defendants—Hall had a high school education and as much experience as a tape librarian as the males who passed her to become computer operators. [See, Tr. 725, 813, 3617–18, 3627–28.]

According to the dictates of *McDonnell Douglas*, therefore, Hall has established a prima facie case of discrimination in promotion. She applied for openings that existed periodically in the computer room; she was qualified for the post; and she was not hired, although Defendants continued to seek and hire others for the position. Further, I find that Defendants have failed to articulate a legitimate reason for not hiring her under these circumstances. Indeed, they simply deny that she ever applied for the position. On the basis of this record, I conclude that Carolyn Madden Hall has proved that she was discriminated against because of her sex.

b. Carol Greenspan

Carol Greenspan's claim of disparate treatment is discussed at length in the context of wage discrimination at the Club later in this opinion. One aspect of her claim, however, is emphasized here because it involves her inability to obtain a promotion within the Training and Development Department.

In 1973, the Company changed its policy regarding employee access to the skills training offered by Greenspan's department and permitted employees across the Company to apply for those courses in which they were interested. Greenspan refused to accept responsibility for the scheduling and teaching of the expanded classes anticipated as a result of the policy change without assurance of a pay raise and change in job title.

That post eventually went to James Magazine at a much higher salary than either that earned by Greenspan or that which John Coulson, the department manager, expected to pay a successful applicant. [Tr. 1429.] In addition, Magazine received a new title—manpower development specialist—which was subsequently evaluated as a grade 8 position.

After Greenspan's departure, her replacement was Robert Lewis, another transferee, who took over her duties at a salary of $17,000, and who was also referred to as a manpower development specialist.

Both Greenspan and Coulson testified at length concerning her frequent and persistent efforts to have her salary and title upgraded to reflect more accurately (as she saw it) her actual functions in the department. [Tr. 1456, 1464–65; 4192, 4271.] When asked by Coulson to draw up a summary of the duties she thought appropriate to her position, Greenspan responded with a list which, Coulson said, described his own job as department head. [Plaintiffs' Exhibit 63; Tr. 1460, 1462; 4193.] The heart of Greenspan's dissatisfaction, Coulson stated, was the fact that, though qualified for advancement, she demanded more than either he or the Company was able to provide under the circumstances. [Tr. 4179, 4192, 4258, 4271.]

Notwithstanding that observation, Coulson justified his refusal to pay her salary commensurate with Magazine's or Lewis' on the grounds that the duties performed by the two men were encompassed by Greenspan's official job title and description, and that agreeing to her request for additional compensation would have been "extortion." [Tr. 4173–74, 4179–80.] Furthermore, the

continued salary advantage enjoyed by the male instructors was warranted, according to Coulson, because of their greater seniority or Greenspan's failure to perform all of her job duties (particularly her secretarial functions). [Tr. 4232, 4246.]

I find that Carol Greenspan has satisfied the requirements expressed in *McDonnell Douglas* for establishing a prima facie case of sex discrimination. In particular, I construe her repeated attempts to upgrade her salary and title as *de facto* applications for promotion and Coulson's refusals as rejections. These rejections came despite the fact that she and Magazine were doing largely the same work for the department and that Coulson himself recognized her qualifications.

Defendants argue that a legitimate reason for Greenspan's non-promotion was her failure to perform all of the duties required of a secretary-instructor. Furthermore, they argue, the salary advantage shared by Magazine and Lewis is a function of the Company's lateral transfer policy and not an act of discrimination against Greenspan.

I do not accept these explanations because they ignore the heart of the matter before me. No attempt was ever made by Defendants to place Carol Greenspan in a position comparable to the male instructors in her department despite her apparent qualifications, her willingness, and the fact that she was already performing those functions. Defendants' reference to the ef-

fect of the lateral transfer policy on the men's salaries simply does not account for the increasing superiority of their salaries over time or the Company's failure to advance Greenspan's salary and grade to a comparable point in view of her actual functions.[22] Even were I to accept these statements as meeting her prima facie case, serious consideration would have to be given the question whether Defendants' explanations, however plausible, are merely pretexts. *McDonnell Douglas.* I need not reach that issue, however, and raise it primarily as an illustration of the weight given to Carol Greenspan's testimony and the evidence in support of her claim. In not crediting Defendants' justification for their treatment of Carol Greenspan, I conclude that in the matter of promotion, she has proved discrimination against her because of her sex.

#### c. Conclusion

On the basis of these individual cases, the statistical evidence concerning comparative rates of movement between grades by men and women at the Club, and the evidence describing the overall distribution of women at the Club, I conclude that women as a group have been discriminated against in the matter of promotion and transfer into PTS positions.

#### 3. Wages[23]

Plaintiffs assert that the Company maintains a policy of paying its female employ-

22. The lateral transfer policy enables an employee, wherever possible, to transfer from one position to another without a reduction in pay. Plaintiffs have stated their belief that the policy has a disparate effect on women; Defendants assert that the policy is justifiable because it applies equally to men and women. At trial I raised some questions expressing my concern that, if the employees most benefited by the policy are the higher-paid employees, and if a majority of those employees are male, then female employees appear not to enjoy the benefits of the policy as much as males.

Having reconsidered the matter, I am not prepared to find on this record that the lateral transfer policy has a disparate impact on women. I am convinced, however, that employment decisions are not immune from examination merely because the policy itself may be

applied on behalf of both males and females. *See*, discussion of wages, section II.C.3., *infra.*

23. The wage claim is brought under Title VII, 42 U.S.C. § 2000e, *et seq.*, and not the Equal Pay Act, 29 U.S.C. § 206(d)(1), presumably as additional evidence of Defendants' discriminatory treatment of females rather than as the basis for a separate recovery of damages. One consequence of this approach is a change in the extent to which Plaintiffs are obliged to prove the substantial identity of the jobs for which they claim males are paid more than females. Under the Equal Pay Act, "substantial equality" involves an examination of the skill, effort, and responsibility involved in the performance of the jobs in question. *Usery v. Columbia University,* 568 F.2d 953 (2nd Cir. 1977); *Brennan v. Prince William Hospital Corp.,* 503 F.2d 282 (4th Cir. 1974), *cert. denied,* 420 U.S. 972,

ees on the whole less than its male employees by relegating them to low-paying clerical positions, by continuing the job evaluation and description system described earlier, and by permitting its supervisors to set the pay of individual employees within the salary grade to which the employees have been assigned. [Tr. 291.] Moreover, Plaintiffs allege that the evaluation system permits the Company to create a variety of jobs which differ in description rather than substance, and which can be used to justify pay differentials, for example, between male employees who occupy these posts and similarly occupied female employees who do not. [*See, e. g.*, Plaintiffs' Exhibit 374 (57 of 129 separate PTS job sequence numbers in 1978 occupied by a single individual).]

In support of their general claim, Plaintiffs introduced evidence that from 1971 to 1978, the mean weekly salary of Defendants' male employees consistently exceeded that of females even when excluding the salaries of the Company's (primarily male) top management.[24] [Plaintiffs' Exhibit 333.] The regression analyses performed by Dr. Mark Killingsworth on behalf of Plaintiffs also purport to demonstrate the salary advantage to males at the Club who are compared to females with similar work and educational experience at the time of hire. [Plaintiffs' Exhibit 403; *see*, section V., *infra*.] More specifically, testimony was heard from several present and former employees concerning their wage histories at the Club. Of these, the cases of Carol Greenspan, Juanita Sailor, and Mary Spatt are the most important.

### a. Carol Greenspan

The relevant portions of Greenspan's claim concern her assertion that while assigned to the Training and Development Department as a secretary-instructor, she was paid substantially less than male employees in the Department who were performing substantially the same functions as she was. In her position as a secretary-instructor, her duties involved teaching secretarial skills (typing, adding-machine usage, and basic writing courses) to other employees, as well as furnishing secretarial assistance to the other members of the Department. [Tr. 1386, 1389.] At the time she joined the Company in 1969, she had a Bachelor's Degree in English, additional post-graduate courses, and three years of teaching experience in Missouri and Michigan local school systems. [Tr. 1381–82.] During the years she was there, Greenspan's position was not officially evaluated [*see*, Plaintiffs' Exhibit 50], but apparently the secretary-instructor post was understood to be a grade four position, with a beginning salary in 1969 of approximately $6,000 per year, later rising to approximately $11,000 at the time of her termination. [Tr. 1427, 4229; Plaintiffs' Exhibit 50.]

In 1973 Greenspan was asked by her manager, John Coulson, to assume greater instructional responsibilities with no corresponding reduction in her secretarial obligations and no corresponding increase in salary. [Tr. 1418.] After she declined this offer [Tr. 1426], the position was then posted throughout the Company as an instructor opening with a proposed salary of about $8,000. [Tr. 1429.] Nonetheless, the individual hired for that opening—James Magazine—was given the title of Manpower Development Specialist by Coulson and a salary of $14,600. Magazine had been earning that amount in his previous position within the Club, and the Company policy of maintaining salary levels in cases of lateral

---

95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). On the other hand, Title VII appears to encompass claims of comparable work not being comparably rewarded which do not achieve the specificity or detail of an Equal Pay claim. *See, Gunther v. County of Washington*, 602 F.2d 882 (9th Cir. 1979). I will interpret this evidence, therefore, in the manner suggested by Plaintiffs and these cases.

24. Defendants' expert, Dr. Drane, also presented an analysis of salaries, part of which dealt with the "initial salary" of males and females who were working for the Club in the same EEOC category in the same year. [Defendants' Exhibit 871.] Although Defendants contend that the results are not statistically significant, it is clear from his tables that, in 14 of the 18 categories in which both males and females appear, males enjoy a higher mean annual salary. [*See*, Tr. *1146–50, *1182–91.]

transfer was applied to his benefit. [Tr. 4175–76.] Magazine's background included a Bachelor's Degree in business administration, some prior teaching experience as a noncertified substitute teacher, and five years' experience with the Company as an accountant and as an analyst in Systems and Programming. [Plaintiffs' Exhibit 70.]

In the fall of 1973, both Greenspan and Magazine were selected and trained as group leaders in the Human Awareness Relations Training Program (hereinafter "HART"), a seminar designed to increase the awareness of Company supervisors and managers of the needs and concerns of minority and female employees. [Tr. 1436–44.] From the date of his transfer to the beginning of HART, Greenspan stated, Magazine was involved only in handling the increased number of employees taking the expanded typing courses for which she was no longer responsible. [Tr. 1434–36.] After the completion of the HART program in 1974, Magazine and Greenspan began working jointly on a supervisory training project, which she continued until her departure in August. [Tr. 1467–68.] During this time, or shortly after, Magazine also began teaching some insurance familiarization courses [Tr. 4236, 4243], while continuing to spend most of his time on the supervisory training project. [Tr. 4343.]

Greenspan claims that throughout her employment with the Club, notwithstanding the substantial similarity of their duties, she never earned more than $11,000, her title was not upgraded even unofficially until shortly before her departure [Plaintiffs' Exhibit 50], and her rate of salary increase never matched Magazine's. [See, Plaintiffs' Exhibit 389.]

Plaintiffs also cite the case of Robert Lewis as another example of the discriminatory treatment that Greenspan received in the Department. Lewis, by Company admission, was a "square peg in a round hole," whose 25 years of service warranted his retention. [Tr. 4195; Plaintiffs' Exhibit 72.] After Greenspan's departure, Lewis was hired to take on certain instructional assignments that she had performed. Due to the Company's lateral transfer policy, Lewis was paid approximately $17,000 for assuming Carol Greenspan's teaching duties. [Tr. 4237.]

Finally, toward the end of Greenspan's employment, Lillie Yarborough was added to the staff as a full-time secretary according to her own understanding of her position. [Tr. 1642.] Soon after Greenspan left, however, Yarborough was assigned the basic and advanced typing courses (and later stenoscript shorthand) without a pay raise. When she complained about the increased duties, she was told that she had been hired as a secretary-instructor and that she was now performing all of her job functions. [Tr. 1642–47.] Plaintiffs argue that Yarborough's treatment substantiates the conclusions that can be drawn from Greenspan's experience.

Defendants reject those conclusions and argue that, contrary to Greenspan's testimony, the work she in fact did in the Department was not comparable to that performed by James Magazine. With the exception of their joint participation in the HART seminar, Defendants contend that Magazine's duties were more extensive than Greenspan's and required training and experience that she did not have. In particular, they point to the insurance classes he taught [Tr. 4236, 4343], as well as the additional skills courses for which he began planning soon after his arrival. Defendants point out further that despite her job title, Greenspan in fact never performed adequately as a Department secretary [Tr. 4232, 4246–47, 4264–66, 4337–40], and at some point, John Coulson apparently decided that she would not be required to fill these functions. [See, Tr. 4264–66.]

Defendants conclude that Greenspan's unfortunate employment experience was largely the product of her aggressive and abrasive personality [Tr. 4272] and her steadfast unwillingness to perform secretarial functions. Her apparent overqualifications for the job she did hold, Defendants suggest, coupled with the limits placed on her promotability by her personality, naturally led to her dissatisfaction and eventual departure.

On the basis of this evidence, I am persuaded that Carol Greenspan was discriminated against because of her sex. Taking into consideration the significant role played by emotion and personality in this testimony, and judging each witness' testimony against the background of evidence about the Department and the Company as a whole, I find credible testimony sufficient to establish that both James Magazine and Robert Lewis were hired at higher salaries to do the same job that Greenspan had been offered or was doing for considerably less money. While the Company's lateral transfer policy accounted initially for these disparities, I note that despite the similarity of later job functions, no effort apparently was made to increase Greenspan's salary in a comparable manner.[25]

Furthermore, the experience of Lillie Yarborough leads me to conclude that the female employees of the Department were generally expected to perform essentially clerical functions, teach clerical skills, and be paid as "clericals" relative to the male employees, despite the similarity of their actual job functions.

Defendants have responded by attacking the accuracy and credibility of Greenspan's testimony. Although Defendants have emphasized the personality conflicts which surrounded her, I do not believe that a clash of personalities can justify the series of employment decisions which resulted in her lower salary and inability to progress within the Department. Defendants do claim, however, that Greenspan's refusal to perform her secretarial duties adequately is a legitimate basis for her treatment by the Company. I cannot agree, for even if she had been performing all of her duties (assuming, arguendo, that she was not), her salary as a secretary-instructor would not have increased as a result, according to Coulson's reasoning, and still would have

been several thousand dollars less than those of the male instructors. I find, therefore, that Defendants have failed to articulate a legitimate, nondiscriminatory explanation for the treatment of Carol Greenspan described on this record.

### b. Juanita Sailor

Juanita Sailor's latest employment by Defendants began in 1970 as a Records Control Clerk in the Data Processing section with a weekly salary of $139.00. Since 1973 or 1974, Sailor has been a teleprocessing coordinator for the Department and currently earns a weekly, grade 7 salary of $296.20. [Plaintiffs' Exhibit 386.] In 1975 or 1976, Robert White was added to the teleprocessing staff to work in part as a back-up to the supervisor and in part as a teleprocessing coordinator. [Tr. 642, 3427.] White transferred in as an analyst from production control with technical and operations experience. His grade 9 salary was maintained in teleprocessing, despite the fact that the women occupying the coordinator's position were assigned to salary grade 7. [Tr. 641.] The record is not clear as to the amount by which White's salary exceeded Sailor's, although the testimony placed the amount between $39.00 and $50.00 per week. [Tr. 640, 3431; cf. Plaintiff's Exhibit 386.]

It is plain from the record that, following an initial six-month period when White was responsible for other, more technical duties on a part-time basis, his job functions were identical in scope and responsibility to Sailor's. [Tr. 652, 708, 3429-31.] Over the course of time, it is equally clear that while the pay gap was closing, White's weekly salary still exceeded Sailor's by a small amount at the time of trial. [Tr. 3431, 3713.]

Defendants contend that the pay differential is simply the consequence of their lateral transfer policy, which is applied to men and women alike. They point out fur-

---

**25.** Indeed, John Coulson referred to Greenspan's request for a pay increase in exchange for the additional instruction required by the 1973 expansion of the training classes as "extortion." [Tr. 4179–80.] Coulson's defense of his refusal to recommend an increase in her salary was based on his determination that the types of duties discussed were instructional in nature and, therefore, within Greenspan's current job description as secretary-instructor, notwithstanding the significant increase in the scope of those duties that could reasonably be anticipated. [Tr. 4173–74.]

ther that virtually all of the differential has been eliminated as a result of altering the size of the periodic increases awarded to the two employees. Nonetheless, there remains a significant disparity in salary grades and the greater earnings potential associated with the higher grade. Defendants have offered several responses to this particular issue, none of which are persuasive, and I refer here specifically to the testimony of supervisors James Stevenson [Tr. 3512–28] and Dan Wilson. [Tr. 3711–16.] Wilson's testimony is at least marked by the frank admission that no plan presently exists for eliminating the disparity, although White's demotion to grade 7 had been contemplated at one time. [Tr. 3715.]

I find clear evidence on this record that Juanita Sailor and Robert White were in fact performing comparable (and perhaps identical) work soon after his transfer into the teleprocessing unit. I find further that, while the salary issue is nearly moot following the latest round of increases, a disparity in grade assignments persists. Defendants have not offered a legitimate justification adequate to dispel the inference of discrimination raised by Plaintiffs' proofs, and I conclude, therefore, that Defendants have failed to meet their burden under *McDonnell Douglas*.

### c. Others

Plaintiffs claim that unequal treatment with respect to wages exists in several other areas of the Company. Two of these— the claims examiners in Claims Administration and rate clerks in the Auto Processing Department—bear further examination.

Prior to 1973 and the introduction of the no-fault insurance law in Michigan, Defendants employed both men and women in a subrogation section of its claims depart- ment, which was responsible in part for the recovery of money owed to the Club by the parties liable for accidents and other damage to the Club's insured members. According to the testimony of Mary Spatt, a Club employee, each of the employees in this section was assigned a territory (i. e., a group of files containing unpaid claims) in which he or she would arrange for collection. In addition, the employee completed the appropriate forms for submission to an arbitration panel for those claims against other insurance companies which could not be resolved. [Tr. 2114–17.] Spatt testified that, on the basis of her work in this area and her observation of her fellow employees, even though there was no substantial difference in job functions, the male employees (called recovery representatives or specialists) were paid more than the female employees (recovery clerks or examiners) in the section. [Tr. 2122; Plaintiffs' Exhibit 392.][26]

When she raised the issue with her supervisor in 1971 or 1972, she recalled him explaining that the higher salary for males was a result of the special training they had undergone, both at the Club and at a two-week property damage evaluation class held in Pennsylvania.[27] [Tr. 2123–24, 2143.] The male employees had also undergone a period of on-the-job training in the branches under the supervision of an experienced claims adjuster. [Tr. 2125, *430.] At that time Spatt was told that the women did not need the policy and liability course for the adequate performance of their jobs, and that if they desired to take the other course, they would become eligible for relocation to any of the branches for a year's training and that their return to home office subrogation would depend on an opening occurring at a convenient time. [Tr. 2125.]

---

26. Plaintiffs' Exhibit 392, drawn from the year-end tapes, compares the weekly salaries, job titles, and salary grades of the male and female employees in subrogation. Male claims representatives at year-end 1978 uniformly are assigned to grades 9 and 10 and enjoy a minimum $100 weekly salary advantage over the females in the grade 5 recovery examiner position.

27. The in-house training was a policy and liability class which concerned the principles be- hind the insurance contract and instructions on the various technical terms found in the insurance policy and their meaning. The Pennsylvania course is given by the Vale Technical Institute and concerns the means of evaluating property damage, proper repair techniques and costs, and other aspects of the adjustment of claims arising from automobile accidents. [Tr. *429–*430.]

After the enactment of no-fault legislation in 1973, the subrogation section underwent changes, including a loss of personnel and a good portion of its duties, particularly with respect to arbitration cases, which were then assigned entirely to the men. [Tr. 2140.] About that time, too, titles were changed, and the male employees were designated claims representatives while the female employees were now claims examiners. [Tr. 2129.]

In 1978 Thomas Bowman was appointed manager of claims administration, and a review of subrogation functions ensued. After bringing their complaints about unequal pay to his attention, the female examiners were told that they were presently exceeding their job functions insofar as they were compromising claims and arranging payment schedules without adequate supervision. [Tr. 2147–49, *437–*438.] As a result, the women's job description was rewritten to reflect a $500 limit on the amount of a compromised claim and a $1,000 limit on the amount of a promissory note that an examiner could approve or sign without the express approval of a claims representative. [Tr. 2147–49, *437–*438.] In addition, completion of the policy and liability class was now required of the claims examiners. [Id.]

On the basis of this evidence, Plaintiffs contend that the female employees working in subrogation were in fact performing the same functions as the male employees notwithstanding their lack of training.[28] Plaintiffs argue that the training requirements are not closely related to the job the employees actually perform in the home office and are used by Defendants as a pretext for paying the women substantially less than the men. Defendants deny that the jobs are comparable, referring specifically to the limitations imposed on the examiners' right to settle a claim [Tr. *449] and the fact that claims representatives in the field are required to use their training constantly in dealing with customers and automobile repair facilities.

28. Mary Spatt has completed the policy and liability class and finished at the head of her class. [Tr. 2151.]

I believe that a statement by Bowman is particularly telling. Although he preferred to refer to the women's functions prior to the revised job description as "exceeding their responsibilities," he admitted that, to the extent that they were "exceeding their responsibilities," they were in fact functioning as claims representatives. [Tr. 2146, 2149.] Thus, Plaintiffs' contention that equal work was being unequally rewarded clearly has some support in the record.

Additional support is found in the case of Edward Hall, a legal investigator for the Club, who was transferred to subrogation around 1977 for health reasons. [Tr. 2137, 2167.] Hall was designated a claims representative III (grade 9) at year-end 1978 despite the fact that he had taken only the policy and liability class by the time of trial, and had neither been trained in property damage evaluation nor assigned to a branch, although the Company expressed an intention to have him complete these requirements in the near future—that is, some two years after his transfer into the section. [Tr. 2137–38, *431, *477; cf. 2169.] Since 1977, Hall has been functioning as a claims representative after being trained on the job by other representatives, under whose close supervision, the Company insists, he must continue to work. [Tr. *477.]

While it appears that the training and experience requirements play some role in the job performance of claims representatives assigned to the branches, lack of that training as a practical matter does not appear to hamper the ability of individuals to function as claims representatives in the home office subrogation section, as the case of Edward Hall and the testimony of Spatt and Bowman reveal. Although I do not believe that the requirements are invalid or pretextual with respect to the majority of claims representatives who work in the branches, I am persuaded that with respect to the subrogation section in the home office, the existence of these requirements

(and the fact that the women do not meet them) does not justify the disparity in grade assignments or salary.

I find, therefore, that the jobs performed by men and women in the home office subrogation section until the revised job description was issued in May, 1978 [Defendants' Exhibit 781] were substantially the same, and that the disparity in grade assignment and salary has not been justified by evidence of a legitimate, nondiscriminatory reason for this disparate treatment of the female employees. I find, in addition, that since the limitations imposed by the revised job description have gone into effect, the positions as described are no longer comparable, and I conclude that Plaintiffs have not established disparity of treatment in the period since May, 1978.

Plaintiffs also assert that two of the Company's positions—rate clerk in Auto Processing and underwriter—entail similar duties and skills, but that women employed as rate clerks are paid less as clerical employees than males employed as underwriters, a technical position.

The argument is based largely on the testimony of Erma Jackson, a Club employee since 1964, who stated on the basis of her experience in both jobs that they were "basically . . . the same." [Tr. 2449; see also, Tr. 2181.] On the other hand, she conceded on cross-examination that, while both jobs require regular reference to the same Company manual for verification of premium amounts and policy requirements, the rate clerk, unlike the underwriter, is not responsible for accepting or rejecting the risk represented by the application for insurance. [Tr. 2465.] In fact, it appears from the testimony of other Club employees, including the manager of the Auto

Processing Department, that the rate clerk's function is limited to examining incoming applications, or those returned from Systems and Programming, for signs of improper coding, inconsistencies, or blank areas in the application form itself. [Tr. 2464–65, *317, *363.] An underwriter, on the other hand, is responsible for making the initial decision to accept or reject the risk of each application based on the applicant's qualifications, Company policy, and the employee's own experience.[29] [Tr. *320, *365.]

I think it clear from even this brief recitation of facts that the work done by rate clerks and underwriters, while similar in their more ordinary tasks, is not sufficiently comparable to establish that the women involved here are treated in a disparate manner.

#### d. Conclusion

I conclude that women as a group have been treated in a disparate manner with respect to the wages they have earned at the Club. This conclusion is based on the individual testimony concerning unequal wages and statistical evidence that average annual salaries of males exceeded those of females. In addition, the evidence concerning the disparate treatment of females seeking promotion or transfer and the evidence of their overall distribution at the Club enable me to infer that Company actions in these areas reflect disparate treatment in the payment of wages as well.

#### 4. Maternity Termination Policy

Prior to trial, Plaintiffs moved for partial summary judgment with respect to Defendants' maternity policy in effect during the relevant period in this case—1974 to 1978.[30]

---

29. An additional group of clerical employees work as rate clerks in the Assigned Risk section of the Auto Processing Department. As part of the no-fault scheme, a certain number of uninsured motorist accounts are sent by the State to the Club as assigned risks. The Club is obliged at that time to assume coverage on the individual. In that context, the rate clerks make use of the Company manual as well as State Motor Vehicle Reports in order to determine the nature of the risk and the appropriate

premium. [Tr. *366–*370.] While this is the same procedure followed by underwriters, I find that the significant characteristic of underwriting—discretion to accept or reject the risk—is absent here, and that this job function is not comparable for Plaintiffs' purposes.

30. When Plaintiffs' motion was submitted, both parties agreed that the issue could be decided on the basis of the briefs presented and any material already on the record. Subsequently, with the consent of the parties, I noted on the

The policy was extensively modified, effective May·22, 1978, pursuant to the amendments of the Elliott-Larsen Civil Rights Act, M.C.L.A. §§ 37.2201(d), 37.2202(c), which bars discrimination based on pregnancy-related matters with respect to terms of employment, including a "benefit plan or system."

According to its terms the policy required an employee to notify the Club within the first three months of pregnancy of the prospective dates of confinement and return, and the employee's ability to continue working in the interim. On reaching the date suggested by her doctor, the employee was required to terminate her employment with the Club. If the employee reapplied for a position within six months of her termination date, the Club would "consider" her for reinstatement in the same or an equivalent position and, upon rehire, restore all benefits and seniority which she had accumulated prior to termination.[31] Failure to reapply within that period, however, would result in her application being treated as that of a new hire, subject to competition with other applicants for available positions at the Club. If hired, the returning employee would have to work a full year before the benefits and seniority accrued during her previous employment were restored to her.

Regardless of whether she applied within the six-month period, the returning employee did face the possibility of being hired for a different position involving a lower salary grade and reduced wage. While it appears that the Club as a matter of practice attempted to secure the same or equivalent positions for returning employees, these efforts were not officially mandated until the revised policy was issued in May, 1978.

According to the deposition testimony of David Schmeiser, Employment Administrator for Defendants, and other evidence on the record, it appears that a pregnant employee had no alternative to termination—that is, she was not permitted to seek a regular leave of absence or to use her sick leave, other sick pay benefits, or vacation time.[32] And, during the time she was away from her job, the burden of maintaining current coverage under various group insurance plans shifted to the employee. As Defendants acknowledge, "A termination of employment under the Defendants' maternity termination policy was, in all respects, treated the same as any other termination." Defendants' Response to Plaintiffs' Trial Brief, 35.

Plaintiffs argue that the bare facts of the policy, as stated, constitute a violation of Title VII because the policy adversely affects the employment opportunities of Defendants' female employees because of their sex. In support of this position, Plaintiffs rely principally on *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), in which the United States Supreme Court found the Company's maternity policy in violation of Title VII because it barred those female employees returning from a mandatory pregnancy leave from using their accumulated seniority for bidding on promotions and transfers.[33] The Court

record that a decision would be rendered simultaneously with my decision on the entire case, and that no further evidence need be introduced at trial relating to the maternity policy.

**31.** There is some doubt as to the accrual of seniority over the period of termination itself. Defendants acknowledge that seniority credit did not accrue during the employee's absence according to the policy as implemented in 1974 and, possibly, 1975. *Cf.*, Defendants' Response to Plaintiffs' Trial Brief, 36 n.10 *with* Affidavit of David Schmeiser, May 21, 1979, ¶ 3(b) *and* Tr. 466, 482–484. In view of the basis of my opinion in this matter, the resolution of this particular factual issue is unnecessary.

**32.** The deposition and trial testimony of David Schmeiser, Defendants' Employment Administrator, indicates that vacation time may have been used as a kind of *de facto* pregnancy leave at least once, but was apparently not a regular practice. *See*, Tr. 465, 489; Deposition of David Schmeiser, 143, 145–48 (10/6/76).

**33.** "Petitioner requires an employee who is about to take a pregnancy leave of indeterminate length. Such an employee does not accumulate seniority while absent, but instead actually loses any job seniority accrued before the leave commenced. Petitioner will not hold the employee's job open for her awaiting her return from pregnancy leave.

found that Nashville Gas Company's policy, regarding leaves of absence for reasons other than disease or disability—which reasons include pregnancy—though facially neutral in its apparent application to both male and female employees, nonetheless violated 42 U.S.C. § 2000e–2(a)(2) because

> It is beyond dispute that petitioner's policy of depriving employees returning from pregnancy leave of their accumulated seniority acts both to deprive them 'of employment opportunities' and to 'adversely affect [their] status as an employee.'

*Id.,* at 141, 98 S.Ct. at 350–51. The Court went on to distinguish *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), for the reason that no showing had been made in that case that the policy of compensating employees for all disabilities except pregnancy favored men over women—i. e., that "the package is in fact worth more to men than to women." *General Electric,* at 138, 97 S.Ct. at 409. By way of contrast, Nashville Gas had "not merely refused to extend to women a benefit that men cannot and do not receive but [had] imposed on women a substantial burden that men need not suffer." *Nashville Gas, supra,* at 142, 98 S.Ct. at 351. But no employer is permitted "to burden female employees in such a way as to deprive them of employment opportunities because of their different role." *Id.* Since the Company failed to present any proof of business necessity, the Court found the policy in violation of Title VII. *Id.,* at 143, 98 S.Ct. at 352.

■ The initial question in this case is whether the implementation of the maternity policy or any part of it constituted an act of discrimination against women. It cannot be questioned, of course, that discrimination suffered by pregnant employees, if found, constitutes discrimination based on sex for purposes of Title VII. *deLaurier v. San Diego Unified School District,* 588 F.2d 674, 677 (9th Cir. 1978). For the purposes of this opinion, the aspects of the policy under challenge which allegedly violate Title VII include: first, the mandatory nature of the termination and the fact of termination itself (as opposed to leave, for example); second, the prohibition on use of accrued sick leave or vacation time for this absence; third, the denial of seniority credit for the period of absence; fourth, the failure to guarantee reinstatement on reapplication following the pregnancy; fifth, the loss of company contributions to the employee's medical and other insurance programs during her absence.

As *Satty* emphasizes, these practices may constitute illegal discrimination only if they "impos[e] on women a substantial burden that men need not suffer." In effect *Satty* describes a two-part test: first, whether the acts complained of constitute a substantial burden on employment opportunities; and, second, whether that burden is shared equally by employees of both sexes.

I find that the practices listed above do place significant burdens on the women's employment opportunities and are not mere failures to extend additional benefits to them. *General Electric Co. v. Gilbert, supra; Nashville Gas, supra. See, deLaurier v. San Diego Unified School District,* 588 F.2d 674, 684 (9th Cir. 1978). For example, the requirement of termination rather than leave obviously hampers an employee's reemployment prospects, especially to the extent she is required to compete once more for a position she had previously obtained at the Club. Despite their best efforts to rehire former employees, Defendants concede that reinstatement at a former position and salary was not formally guaranteed until May, 1978. Aside from the se-

An employee who wishes to return to work from such leave will be placed in any open position for which she is qualified and for which no individual currently employed is bidding; before such time as a permanent position becomes available, the company attempts to find temporary work for the employee. If and when the employee acquires a permanent position, she regains previously accumulated seniority for purposes of pension, vacation, and the like, but does not regain it for the purpose of bidding on future job openings."
*Nashville Gas Co. v. Satty,* 434 U.S. 136, 138–39, 98 S.Ct. 347, 349–50, 54 L.Ed.2d 356 (1977).

vere effects of a reduced income, an employee who has been rehired into a lower-paying, less-challenging position may well find her career plans drastically altered as a result of her inability to resume her former job.[34] In addition, the year's delay in restoring previously-earned benefits also imposes a substantial, albeit temporary, burden on those employees unable to return within six months of their termination. Cf., Burwell v. Eastern Airlines, Inc., 458 F.Supp. 474, 494 (E.D.Va.1978).

Even more clearly perhaps, the loss of seniority credit for the period of termination and the loss of other employee benefits upon termination—or the employee's assumption of their full cost in order to maintain coverage—have a direct and potentially substantial impact on the employee on account of her pregnancy, and cannot be viewed merely as the result of Defendants' decision not to extend additional benefits to its female employees.[35]

Finally, Defendants' prohibition on the use of accrued sick leave or vacation time for a pregnancy-related absence seriously limits their value to female employees and,

for that reason, I believe the practice is also a burden on their employment opportunities. See, deLaurier, supra, at 684–85. But cf., Equal Employment Opportunity Commission v. Children's Hospital, 556 F.2d 222 (3rd Cir. 1977), cert. denied, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978) (prohibition on use of sick leave not discriminatory in view of Gilbert; no rationale offered); Harriss v. Pan American World Airways, Inc., 437 F.Supp. 413, 436 (N.D.Calif.1977). Although Harriss makes a strong case for analogizing the permissible use of accumulated sick leave to the availability of disability insurance benefits at issue in Gilbert, I believe that the distinction raised in deLaurier is crucial and that the employee's accumulated sick leave (or vacation time) is more properly viewed as a type of compensation because it is earned by the employee and has a monetary value to her. Prohibiting its use for certain purposes reduces its usefulness and thus its value to the employees affected. I conclude that, since pregnancy is sex-related the bar on the use of sick leave or vacation time for pregnancy-related absences constitutes a burden on the

---

34. In response to an employer's contention that its policy of not guaranteeing reinstatement to employees returning from maternity leave who had been unable to return within six months of delivery was less insidious than the deprivation of accumulated seniority condemned in Nashville Gas, supra, the court in Burwell v. Eastern Airlines, Inc., 458 F.Supp. 474, 493 n.6 (E.D.Va. 1978), noted:

The issue is not simply seniority; it is reinstatement. With respect to reinstatement, the effects of Eastern's policy can be as harmful as Nashville Gas Company's policy. The essence of Ms. Satty's complaint against Nashville Gas was that the policy made it difficult for her to regain a permanent position with the company following maternity leave. An Eastern flight attendant unable to return from maternity leave within the specified time limits might similarly find it difficult, perhaps impossible, to regain her position as a flight attendant. It obviously makes no difference to an employee returning from maternity leave whether she is denied reinstatement to her former position because her employer has taken away her seniority or because her employer has imposed a time limit which she is physically unable to meet.

35. Although neither the policies nor the parties' briefs address this point, it appears that an employee who has terminated because of pregnancy may completely lose the value of the unused sick leave she has accumulated during the calendar year prior to her departure if her reapplication for rehire is not made before the end of that calendar year. This result would seem to follow pregnancy-related absences and the fact that entitlement to sick leave normally expires at the end of such calendar year.

A similar result may obtain with respect to unused vacation time. The vacation policy states that unused vacation time will be paid out to employees in good standing prior to termination. Although the pregnancy policy does not address the matter explicitly, I assume that pregnant females are equally entitled to this benefit and do in fact receive it, particularly in view of Defendants' practice of paying out the unused vacation or "bank" time of employees commencing military leave and "short service" employees who are terminated following the expiration of their 90-day extended disability leave. Cf., Harriss v. Pan American World Airways, Inc., 437 F.Supp. 413, 437–38 (N.D. Calif.1977) (requirement that pregnant employees, though not others, liquidate accrued vacation benefits on beginning maternity leave rather than use the time itself violates Title VII).

employment opportunities of women at the Club.

In general, Defendants' practices do *not* result "merely [in] a loss of income for the period the employee is not at work," but rather have the "direct effect upon either employment opportunities or job status" which constitutes a possible violation of the statute. *Nashville Gas, supra*, at 145, 98 S.Ct. at 353.

Having set forth the reasons for which I believe that Defendants' policies significantly burden the employment opportunities of their female employees, the question remains whether these burdens are borne equally by female employees and similarly-situated male employees. To the extent that they are shared equally, no finding of illegal discrimination can be made.

Defendants have, in fact, taken that position with respect to Plaintiffs' claim, arguing forcefully that the policy applicable to female employees who terminate because of pregnancy is no more burdensome than the policy applied to *any* employee (male or female) required to terminate his or her employment due to a disability not otherwise covered by any of Defendants' disability or leave of absence plans then in effect.

In support of their position, Defendants point to their policy concerning disabled employees who do not return to work following the expiration of their previously-allotted sick leave (usually 14 weeks). Such an employee, Defendants maintain, is terminated and required to make a new application if she or he subsequently desires to return to work at the Club. If rehired, the employee must work for a full year before having previously-accrued seniority and other employee benefits restored.

Defendants assert that this policy is for all intents and purposes identical to the maternity policy,[36] and since it is applicable to both men and women in the Company, no

burden has been placed on women that need not be borne by men at the Club.

Despite the apparent reasonableness of Defendants' position, I disagree. The key to Defendants' argument is found in this defense of their maternity policy:

[T]he burden on women unable to work because of pregnancy was exactly the same as the burden on any person unable to work because of a disability *who either had exhausted the benefits of the plan or was not entitled to them for lack of credited service and was therefore also 'excluded from a disability benefit plan.'*

Defendants' Response to Plaintiffs' Trial Brief, 41 (emphasis added).

As Defendants' statement and the substance of its leave policies make clear, the only employees who are treated in the same fashion as pregnant females are those who have exhausted all of the leave options available to them. But the comparison is misleading and unpersuasive because pregnant females are never given the opportunity to exhaust whatever benefits to which they may be entitled. Instead, they are required to terminate regardless of the availability of unused vacation or sick leave and without the opportunity to apply for a special leave of absence. In effect, Defendants suggest that a comparison of the employees who occupy this unfortunate category because they have actually exhausted their options with those female employees who occupy this category solely because they are pregnant will find both males and females similarly affected. While that may be true,[37] the observation misses the point. I do not believe that a company may impose substantial burdens on its female employees and then claim to have met its obligations under Title VII simply by imposing similar burdens on some other group of employees who are neither similarly situated nor otherwise comparable to the disadvantaged females.

**36.** With the exception that for reapplications within six months of termination, the maternity policy is more lenient.

**37.** Since the parties agreed to a decision on the papers, no evidence was submitted regarding the application of Defendants' policies in actual

circumstances. Defendants' representations are therefore viewed most favorably, and I accept their contention for these purposes that male employees have been affected by the policies as they describe.

The pertinent inquiry must be whether the employment opportunities of Defendants' female employees were hampered in ways that the opportunities of similarly-situated males were not. In this case such an examination reveals that female employees are relegated to the status of "least entitled" to the full use of their Company leave options solely because of their pregnancy and not because they have in fact exhausted or become ineligible for these options. Defendants have not represented, nor do the policies themselves reveal, that any male employees with unused vacation time or sick leave at his disposal was prohibited from using either under similar circumstances. I find that such treatment deprived these women of the equal employment opportunities to which they were entitled. Since Defendants have made no representation that such policies were required as a matter of business necessity,[38] I conclude that the maternity termination policy in effect from 1974 to 1978 discriminated against Defendants' female employees in violation of § 703(a)(2) of the Civil Rights Act of 1964.

III. The Class of Applicants

■ Most of the evidence presented by Plaintiffs in support of their claim that Defendants discriminate against women with respect to application and hire consists of statistical comparisons of the application and hire ratios of men and women in the clerical and Professional, Technical, and Sales areas. Testimony was also heard from several women who had applied unsuccessfully for PTS jobs with the Club. The following discussion examines separately female representation in the applicant flow, comparative rates of success in hire, and the lay testimony in support of the statistical evidence.

A.

Plaintiffs' attack on Defendants' hiring practices [39] begins with the actual distribution of women in the two application categories—clerical and PTS. According to Plaintiffs' Exhibit 426, women apply for PTS positions at the Club at a rate well below that of women nationwide in either 1970 or 1977. The sole exception is 1978, in which the application rate for women is slightly ahead of the 1970 census figure and only slightly below the 1977 Survey results.

Defendants, however, contend that the rate of female applications for PTS positions is actually higher than comparable state or national figures. [Defendants' Exhibit 850, p. 30.] In fact, Defendants are comparing the actual rate of female PTS applications to the Club with an "expected percentage" of female applicants, which is based on calculations derived from the 1970 detailed census data discussed earlier. In turn, those calculations are based on an "expected number" of female employees in 24 detailed job categories, which, Defendants assert, constitute the range of PTS-type positions available at the Club. The breakdown of the PTS field by detailed job codes, however, is based on census (not Company) definitions and excludes the computer operator and claims representative positions, for example, which the Company itself classifies as technical positions. [Tr. *906.] As I have noted before, I am not persuaded that the 1970 census data offers the most helpful basis on which to compare female employment activity at the Club. Furthermore, the adoption of the detailed job codes also raises the difficulty, previously discussed, of defining "female availability" in so narrow a fashion. Notwithstanding these objections, I find it unnecessary to determine the accuracy or merit of these statistics for the reasons set forth below.

---

38. As a general matter, I would not now find such a claim particularly persuasive in light of the policy change in May, 1978. While the change admittedly occurred in response to legislative mandate, no suggestion was made here that the company has been unduly burdened by its new policy.

39. "Hiring," as the term is used here, refers to the hiring of individuals from outside the Company and does not include transfer, promotion, or any other employment decision which results in an employee performing a different job function within the Company.

Plaintiffs attribute this alleged disparity to certain pre-employment practices, including gender-specific newspaper advertisements, failure to recruit female applicants adequately, use of separate employment application forms for clerical and PTS positions and, following the adoption of a single form, the continued separate filing of clerical and PTS applications, and the failure of Defendants to provide adequate information to prospective employees at the time of application about the various current job openings at the Company.

Plaintiffs' principal objection concerns the manner in which referral or walk-in applicants are treated by the Personnel Department receptionist—i. e., the information the applicants are given about job openings, the exploration of their qualifications and interests, and the decision by the receptionist to classify them as clerical or PTS applicants (or both).[40] Plaintiffs contend that classification as a clerical or PTS applicant is of overwhelming importance to an applicant's chances for advancement at the Club because of the systematic and disparate way in which employees in both categories are treated by the Club. Moreover, that determination is made by a receptionist [Tr. 93–94, 106–107] who, Plaintiffs suggest relies as much on assumptions and biases concerning female applicants as she does on the applicant's own interests and qualifications. [Tr. 106–107.] Finally, Plaintiffs attack the use of dual applications and a dual filing system as indicative of the channeling which prevents women

from being considered for better jobs both at hire and thereafter.

The chief difficulty here is the lack of evidence which tends to describe the impact of these practices on applicant behavior. Aside from the general statistics described earlier, little evidence exists to link these practices to a disproportionately low female rate of application for PTS jobs (assuming, arguendo, that the rate is disproportionate).[41] I am not willing, therefore, to find on the basis of that evidence alone that those practices in and of themselves are discriminatory, although (as will be seen later) they may be vulnerable as part of the entire package of employment practices that concern hiring.

B.

In determining the possible disparate impact of hiring procedures on members of a particular group, widespread preference is accorded comparisons of the actual rates of hire with the actual rates of application when such evidence is available. *See, Hazelwood School District v. United States,* 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742, n.13, 53 L.Ed.2d 768 (1977); *Smith v. Troyan,* 520 F.2d 492 (6th Cir. 1975); *Hester v. So. Railway Co.,* 497 F.2d 1374, 1379 (5th Cir. 1974); B. Schlei and P. Grossman, *Employment Discrimination Law* 1165–66 (1976), 320–321 (Supp.1979). In this case, Plaintiffs' Exhibits 440 and 441[42] and Defendants' Exhibits 850 and 894 are based on this data from which the following findings are derived.[43]

**40.** While Plaintiffs have cited the other practices listed, little evidence was offered on these points, and their impact on the application process is largely a matter of conjecture. For example, Plaintiffs argued that Defendants' advertising policy for a number of years entailed the placing of gender-specific newspaper advertisements. But most of the examples to which Plaintiffs refer lie outside the period of liability in this case, and one example that does qualify [Defendants' Exhibit 773] is insufficient evidence on which to judge the entire policy during this time period. Similarly, the evidence concerning recruitment practice is too insubstantial [*see*, Tr. 232–234, 429–431.]

**41.** For example, Plaintiffs attribute the rise in PTS applications from women following 1976

to the replacement of the dual applications with a single form. While that may be a valid inference, it seems equally likely that a general increase in the rate of female applications may also account for the increase inasmuch as the application rate for clerical positions increased significantly as well over this period. *See,* Plaintiffs' Exhibit 426.

**42.** Plaintiffs' Exhibits 440 and 441 are essentially the same analysis, although the actual figures are slightly different. Since Plaintiffs' Exhibit 441 is based on updated information provided by Defendants, I will use that exhibit in this discussion.

**43.** These exhibits are based, in turn, on Plaintiffs' Exhibit 436, which consists of handwrit-

In the period 1974–1978, the Club received approximately 18,400 applications for employment, 66.6% of which were for clerical positions and 33.4% for PTS jobs. Of all applicants, 64.6% were female, 84.8% of whom applied for clerical positions and 15.2% of whom were classified as seeking PTS posts. Male applicants constituted 35.4% of all applicants; of the males, 33.5% applied for clerical openings and 66.5% for PTS positions. In short, the predominance of female applicants and their significant association with the group of applicants for clerical positions are clearly established by this data, and the same can be said for males with respect to the PTS field.

Of the 18,400 applicants, some 1,409 or 7.66%, were actually hired. While male applicants enjoyed a success rate of approximately 9.84%, female applicants lagged somewhat with a 6.46% rate of success based on these figures, despite the fact that female new hires outnumbered males—768 to 641. Of all the new hires, 62.8% were assigned to clerical jobs, and women constituted 70.8% of this group; on the other hand, 37.2% of new hires were given PTS jobs, women making up 26.9% of this group. From another perspective, the figures indicate that 81.6% of the 768 female hires ended up in clerical posts, 18.4% in PTS; for the males, 40.2% obtained clerical positions and 59.8% achieved PTS status.

The conclusions that are drawn from these figures are based on the same principles guiding the comparisons of female distribution in the Company with the outside work force, *see* discussion *supra,* and are not contested. First, women as a group are less likely to be hired by the Club than men as a group. Second, female applicants are (perhaps surprisingly) less likely to obtain clerical positions than male applicants. Moreover, the differences in these male and female rates of hire are statistically significant, thus rendering the possibility that these results could have occurred by chance extremely unlikely. [Tr. 3291–92; Plaintiff's Exhibits 440, 441; Defendants' Exhibit 850, p. 38.] Third, there is no significant difference in the comparable male and female rates of hire into PTS positions. [Tr. 3292–93, 3324.] Further inquiry into the PTS data is warranted, however, for two reasons: one, the distinct underrepresentation of women in this area of the Company; and, two, the possible bias in the underlying applicant flow data, which, if it exists at all, as Plaintiffs suggest, will have its greatest effect on the rate of female application for PTS positions.

Serious difficulties are presented by the statistical evidence relating to PTS hires. Plaintiffs' Exhibit 438 purports to demonstrate that female new hires are assigned to PTS positions less frequently than male employees and at rates which are statistically significant. [Tr. 3284.] Defendants, however, reject the entire "assignment" analysis on the grounds that it assumes that all applicants to the Company can be or are assigned without reference to their qualifications, job requirements, or any other determinative factor. [Tr. *595.][44] Although

---

ten records kept by members of the Personnel Department, and which analyze the applicant flow in terms of position applied for, source of the applicant (e. g., referral or walk-in), and the applicant's gender and race.

Plaintiffs acknowledge the usefulness of this data, but argue that, at best, the data must be viewed skeptically for at least two reasons. First, this data is based only on positions filled by the Department, hence information about the hiring of management personnel is excluded because such hiring is usually done directly by higher management. Second, Plaintiffs point out that the classifications made here were created by the Company and that assign-ment to the clerical or PTS category is as much a function of discriminatory practices as the actual hire itself. Thus, Plaintiffs conclude, these figures as they apply to women should be accepted as the minimum numbers applicable, particularly in the case of female applications for PTS jobs, which, Plaintiffs contend, seriously understate the actual willingness (hence availability) of female applicants to apply for and accept these positions.

**44.** Defendants also argue that the notion of "assignment" itself does not adequately describe their hiring process in which an applicant is hired into a specific position and not

I have rejected in another context Defendants' argument that PTS positions require specific skills not generally available, I do believe that Plaintiffs' approach in this matter wholly eliminates the role of factors relating both to the job in question and the applicant and their influence on the application and hiring process. Were all of the applicants equally capable of fulfilling any job function at the Club, then the assignment analysis might be probative of discrimination against women with respect to PTS hires. In another setting, however, Plaintiffs have acknowledged that, at least for purposes of comparing female representation in the Company's PTS jobs with the relevant labor market, the proper ground for comparison is the female presence in various occupational categories and not merely female representation in the population as a whole. Implicit in that position, I believe, is a principle somewhat inconsistent with Plaintiffs' position in this exhibit. I find that this evidence without more does not establish discrimination in the assignment of new hires.

The other set of data which relates to PTS hires concerns sales hires specifically. See, Plaintiffs' Exhibit 439; Defendants' Exhibits 816, 893. Sales positions, particularly commissioned sales, are important because they are on average the most lucrative non-management positions available at the Club, and breakdowns are available for sales hires unlike other PTS jobs. Nonetheless, these figures must be used with caution because the data is often flawed and inconsistently classified. [See, e. g., Tr. *821–*822, *829–*830.]

Statistical evidence on overall sales hires from 1974–1978 is scant. Plaintiffs' Exhibit 439 only includes data from 1973–1975 [Tr. 3288–89, 3321], although even on that limited basis, Plaintiffs' expert concluded that female PTS hires were hired at disproportionately lower rates into sales than male hires. That tentative assessment is apparently supported by Defendants' Exhibit 816, which suggests that from 1974–1978, approximately 22.9% of the sales hires were female, while 77.1% were male.[45] On closer examination, Defendants' Exhibits 816 and 893 suggest that from 1974–1978, the percentage of female applicants hired has equaled or exceeded the percentage of male applicants hired, and that the percentage of female hires has exceeded the percentage of all applicants that was female in each year since 1974.

Specific information on commissioned sales hires can be extracted from Plaintiffs' Exhibit 335, which describes hires by Defendants' occupational categories and indicates that only 5.5% of commissioned sales hires 1974–1978 were women.[46] That figure is consistent with the overall 2.3% female representation in commissioned sales. [Plaintiffs' Exhibit 334; cf. Defendants' Exhibit 850, p. 27.]

On the basis of this evidence, I am unable to conclude either that women are being hired at significantly disparate rates into sales positions at the Automobile Club or that they are not. Due to the lack of adequate data on which to base reliable comparisons of rates of application and hire, this evidence is clearly insufficient to aid in the determination of discrimination in PTS hires as a whole.

### C.

Lay testimony concerning the class of applicants was heard from Altha Brown

---

hired first, then assigned later to a given job. I do not believe this objection to be particularly tenable or material to this analysis. I note, in any case, that Defendants' own Exhibit 871, p. 1, can be interpreted as an "assignment"-type analysis. Although framed in terms of success in obtaining the position sought, all of the individuals analyzed there were, in fact, hired. Thus, the "success" actually being measured is success in job assignment.

**45.** With respect to Defendants' Exhibit 816, "sales" includes both commissioned and salaried sales positions, and "hires" include both actual hires from the outside as well as transfers from within the Company.

**46.** The disparity between this figure and those reflected on Defendants' Exhibits 816 and 893 is explained, I believe, by the way in which Defendants have defined "hire" and "sales." See, note 45, supra.

and several other women. Brown testified that she had worked for Defendants from 1970 to 1973 in various branches around the State and in various positions. [Tr. 989.] Brown and her husband then moved to Kansas City, Missouri, where she worked for the Automobile Club of Missouri as a sales agent. [Tr. 1007.] On their return to Michigan in 1974, Brown applied for reemployment with the Club as a sales representative. [Tr. 1008.] Despite her apparent qualifications, she was not hired. [Tr. 1031.]

Defendants' explanation for rejecting her application dealt with her frequent transfers and family moves in the recent past. [Tr. 4109–10.] At each time, the occasion for the move was her husband's transfers from one position to another within his company's operations. [Tr. 1048–55.] Notwithstanding her record in this regard, Brown told her interviewer that, if she were successful in obtaining the lucrative sales position, her husband had agreed to forego future job assignments that would require her to leave her job. [Tr. 1023–24.] The Company apparently did not accept her representation and rejected her application. [Tr. 4110.]

Although Plaintiffs endeavor to interpret this decision in terms of the Company's stereotyped view of its female workers and their commitment to their employment, I am unwilling to do so. Whatever Defendants' actual motivation, I cannot say that their justification for not hiring Brown is neither related to business need nor a legitimate conclusion easily drawn from her work record. I cannot find that Brown's rejection is an act of discrimination under the law.

Of the remaining lay witnesses, the only extended testimony came from Dawn Warren, who was in fact successful in obtaining a sales position with the Club. Although her course of application and hire may have been rough, I am unable to find grounds for a complaint of discrimination hereinasmuch as she obtained the position in question. Finally, other witnesses did describe the circumstances of their unsuccessful applications for hire at the Club, but their cumulative testimony is simply insufficient on its own to suggest that Defendants were acting in a discriminatory fashion.

### D.

Having reviewed the body of evidence that deals specifically with the application and hiring procedures of the Automobile Club, I conclude that Plaintiffs have shown discrimination against women in their overall rate of hire, as well as discrimination against women in the rate of hire into clerical positions.

With respect to the comparative rates of hire into PTS positions, however, Plaintiffs have failed to establish the statistically disparate impact of Defendants' practices on women applicants. In so concluding, I bear in mind that a possibly significant bias exists in the applicant flow data which underlies these studies, and that the representation of women in PTS positions is so low as to suggest that the hiring practices must have some impact. Nonetheless, neither the statistics offered nor any of the lay testimony adequately demonstrates that proposition.

The rates of hire into sales positions illustrate this problem well. Despite the fact that women make up such a small portion of the total sales force, the rate of hire statistics suggests that at least since 1974, they have been hired at frequencies exceeding those of males. As Defendants have pointed out, the relevant periods in question do not extend beyond 1974 except for background and interpretive purposes. Furthermore, while pre-1974 employment decisions may have some probative force, the significance of that evidence depends in large part on whether "relevant aspects of the decisionmaking process [have] undergone . . . change." *Hazelwood School District, supra,* 433 U.S. 299, 309 n.15, 97 S.Ct. 2736, 2742, n.15, 53 L.Ed.2d 768 (1977). I believe that the statistical evidence with respect to sales supports an inference that the hiring procedures in sales administration have undergone some change since 1974. For these reasons, I am

unable to find that Defendants' hiring practices have a disparate impact on women applying for PTS positions.

IV.   The Class of Former Employees

Plaintiffs raise claims of sex discrimination on behalf of four named individuals and the class of former employees. According to the terms of the class certification order, former employees claiming discrimination after January, 1974, are represented by Carol Greenspan. Many of Greenspan's claims (and, by extension, those of the class) have been discussed earlier with respect to Defendants' wage and promotion policies. The remaining claims presented by Plaintiffs on behalf of this class deal with alleged acts of retaliation and constructive discharge as a result of the women's participation in this or related actions. In addition to Carol Greenspan, similar claims were made on behalf of Diane Kula, Linda Iler Gibson, and Pat James.

■ Retaliation against an employee for participating in a suit of this kind is prohibited by § 704(a) of the Civil Rights Act, 42 U.S.C. § 2000e–3(a). *McDonnell Douglas v. Green*, 411 U.S. 792, 796, 93 S.Ct. 1817, 1821, 36 L.Ed.2d 668 (1973); *Mitchell v. Mid-Continent Spring Co. of Kentucky*, 583 F.2d 275, 278 (6th Cir. 1978). As with other claims of discriminatory treatment, Plaintiffs are required to show a prima facie case of retaliation before Defendants must provide a legitimate reason for the action taken. In proving the prima facie case, Plaintiffs must show that the employee participated in a protected activity, that Defendants were aware of her participation, that retaliation or discharge subsequently occurred, and that Defendants' retaliatory motives were expressed or can be inferred from the period of time elapsed between the alleged act of retaliation and her activity. *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319, 1326 (S.D.Ohio 1978); *Hochstadt v. Worcester Foundation, Inc.*, 425 F.Supp. 318, 324 (D.Mass.), *aff'd*, 545 F.2d 222 (1st Cir. 1976). Plaintiffs, of course, are also permitted to show that the Company's purported justification is pretextual. *Sutton, supra; Hochstadt, supra.*

■ The standard of proof in cases of constructive discharge is based on evidence that Defendants made working conditions so intolerable as to force the employee into an involuntary resignation. *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144 (5th Cir. 1975); *Jacobs v. Martin Sweets Co., Inc.*, 550 F.2d 364, 370 (6th Cir. 1977); *National Labor Relations Board v. Tennessee Packers Inc.*, 339 F.2d 203, 204 (6th Cir. 1964). Whether Plaintiffs are required to show some evidence of Defendants' *intent* to force a resignation appears to be a debatable issue. *See, e. g., Muller v. United States Steel Corporation*, 509 F.2d 923, 929 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975) (constructive discharge occurs when an employer "*deliberately* renders the employee's working conditions intolerable.") (emphasis supplied). Although neither *Jacobs* nor *Tennessee Packers* speaks in terms of an employer's express intent, I note that an element of implied intent is found in the latter case, 339 F.2d at 205, and that *Jacobs* involved a deliberate course of action undertaken by a senior vice-president in order to terminate the employee. *Jacobs, supra*, 550 F.2d at 367–368.[47] For the purposes of finding a constructive discharge, the facts in *Jacobs* and *Tennessee Packers* offer a useful benchmark against which to measure the actions of the Company on which Plaintiffs' claims are based.

■ Plaintiffs allegation that the circumstances of Carol Greenspan's departure in 1974 constitute a constructive discharge is based on the manner in which she had been treated by her superior, John Coulson, over the period of time that she was a member of the Training and Development staff. In particular, Plaintiffs argue that

---

**47.** While the court in *Jacobs* distinguished *Muller*, 550 F.2d at 370 n. 10, it did so on factual grounds, while citing the proposition that all such cases depend in each instance on their particular set of facts. *Id.* In my conclusions in this aspect of the case are necessarily based on that principle.

the series of incidents culminating in a heated, public confrontation with Coulson are evidence of Defendants' success in making her working conditions so intolerable as to force her resignation.

But Plaintiffs have not shown by a preponderance of the evidence that any of the actions taken by Greenspan's superiors were part of a deliberate plan to force her from the Department. Indeed, Coulson testified that Greenspan's resignation announcement came immediately after his apology to her following their heated exchange. [Tr. 4192.] Moreover, Greenspan explained her decision to resign in terms of her desire to achieve her career goals faster than her job at the Automobile Club would permit, but she did not refer to any perception that she was being forced out of that job by Defendants. [Tr. 1483–84.] Finally, the conduct cited by Plaintiffs in support of their claim simply does not rise to the level of concerted and sustained pressure found in *Tennessee Packers* or *Jacobs* which would justify a finding of either an implied or express intent to discharge.

I do find that Greenspan's resignation was due in part to the long-running pattern of disagreement, argument, and confrontation between her and Company management, but that this conduct—though fueled by Company policy and practice as well as personality—did not make her conditions of employment "so intolerable" as to dictate a finding of constructive discharge.

Diane Kula bases a claim of discriminatory termination on the actions of the branch manager in Bay City where she was employed by Defendants as a unit leader in the Claims section until her resignation in 1977. In that year the branch had a supervisory opening for which Kula was eligible and a likely choice. But her manager stated that, because of her attitude and questionable loyalty, he would not be able to recommend her for the supervisor's post. [Tr. 2278–81.] Although Plaintiffs interpret these statements as evidence of retaliation for her participation in this lawsuit, I am unable to accept that explanation. First, Kula herself explained the loyalty charge not in terms of her challenging the Company's employment policies,[48] but rather as a matter of her own behavior with those under her supervision before whom she might undermine or question the manager's performance. [Tr. 2328–31, 2302–03.] Second, there is evidence that personal differences again played a major role in Kula's decision to leave. [Tr. 2260, 2270–75, 2280–81.] I conclude here as well that Plaintiffs have failed to produce evidence sufficient to link Kula's resignation with her involvement in this suit and, more importantly, that her branch manager or any other Club official made the conditions of her employment so intolerable as to cause her termination.

In 1977 Linda Iler Gibson terminated her employment with the Club following a disciplinary incident. [Tr. 2200–04.] Plaintiffs argue that this incident—the first ever to appear on her personnel record after several years of satisfactory service—occurred subsequent to Gibson's involvement in this action and thus is evidence of retaliation. [Tr. 2206–09.] Defendants, on the other hand, contend that disciplinary action was warranted by Gibson's unsuitable behavior on the job, and that her work habits had worsened somewhat following a demotion from her position of assistant supervisor as a result of a general staff reduction in the Auto Processing Department. [Tr. 2189–90; *288–*292, *362.] As Defendants point out, there is no evidence that either Gibson's supervisor or the department manager were aware of her support of this suit at the time of the incident, and any attempt to link these with her termination must rely

---

**48.** Kula's involvement in this suit may have begun as a result of the termination of her previous employment with the Automobile Club in 1973 as a result of her marriage to a fellow worker at the Bay City branch. As it developed, a mutual misunderstanding of the Company's policy regarding employees married to one another was responsible for her termination. After some negotiations with the Club, she was rehired in 1974. [Tr. 2276–78.] These events, of course, predate this action and cannot be offered as evidence of Defendants' discriminatory behavior.

on conjecture and coincidence. [*See*, Tr. 2206–08.] I do not find this a sufficient basis for determining that either retaliation or constructive discharge were involved.

Finally, a claim of retaliation and discriminatory termination is raised by Pat James, who, unlike the others in this group, is currently an employee of the Club. In 1975 James transferred to the Personnel Department from the Member and Policyholder Services Department. [Tr. 2357.] Some time following her transfer, James testified that she was called into the office of Department Manager George Nimmo who questioned her about the fact that her name had come up in a deposition taken by Company attorneys in another discrimination suit against the Company. [Tr. 2371–72.] A year later James severely injured herself, and medical complications required a lengthy leave of absence from her work in Personnel. [Tr. 2373–75.] More than ninety days after her leave began, James was advised that according to Company policy she was required to terminate. [Tr. 2376.] Around this time James filed a claim alleging discrimination based on race with the Equal Employment Opportunity Commission. [Defendants' Exhibits 782, 824.] On reapplication James was hired by Defendants, but given a lower position in Personnel than the one she had previously occupied. [Tr. 2382.]

On the basis of this evidence, Plaintiffs argue that James, a suspected "informer," was not granted as long an extension of her leave as other employees had received, and on return was not reassigned to her old position, which had been given to a female employee preferred by the Company as part of an effort to penalize James for her support of the challenges being made to the Company's employment practices. Defendants respond that James was replaced only because of her inability to advise them of a likely date of return [Tr. 2378], that no evidence was offered to link the decision to terminate with the Nimmo conversation a year earlier, and that James herself did not suggest retaliation as a possible motive when given the opportunity to discuss her termination and rehire. [Tr. 2385.]

I do not believe that the evidence Plaintiffs offer supports their suggested conclusion. James' injury and her consequence absence from work (however warranted) undoubtedly placed a burden on Defendants. [*See*, Tr. 2376–78, *1042–*1044.] In this context, I find that her termination and rehire in accordance with Company policy were not unreasonable actions and do not constitute acts of retaliation or discriminatory discharge.

V. Regression Analysis

Regression analysis is a statistical technique which permits an observer to calculate the effect of a variety of independent variables on a particular result (or dependent variable). The use of computers in the process vastly reduces the amount of time necessary to perform this analysis and allows the observer to increase the number of variables whose effect on the dependent variable under study may thus be determined. In this case both Drs. Killingsworth and Drane have used the regression technique in order to determine the effect of widely differing sets of factors—including sex—on the salary of an employee at the Automobile Club; for these purposes, salary is the dependent variable and sex or gender the principal independent variable under consideration.

Both parties have spent a great deal of time and effort on attacking the techniques, the theories, and the application of the regression offered by the other, while defending their own firmly and at great length. Despite that effort, the proper role of regression analysis in this case must not be misunderstood. As Plaintiffs acknowledge in their Post-Trial Brief, p. 54, their regression analysis, in essence, constitutes rebuttal rather than prima facie evidence. To the extent that Dr. Killingsworth has sought to include in his regression equation all of the pre-employment factors he can characterize as having a possible effect on a person's salary, he is anticipating and (Plaintiffs contend) negating any legitimate, nondiscriminatory explanation of salary differential which Defendants might

wish to raise along these lines. But unless Defendants successfully rebut Plaintiffs' prima facie case, the regressions are simply more corroborative than probative.[49]

For these reasons, I view Plaintiffs' regressions as additional support for my findings that Defendants have discriminated against their female employees not merely with respect to wages (the actual subject of the studies), but in other areas as well. For example, I believe it reasonable to conclude that discrimination with respect to salary is at least indicative of discrimination in job assignment, promotion, or transfer, given the close relationship between salary grade and job classification. But I do not base my findings of fact or conclusions of law in any area that I have discussed on Plaintiffs' (or Defendants') regression results. Rather, I have used them, where helpful, as an aid to understanding the positions of the parties on these issues and, to a more limited extent, as evidence tending to support one position or the other.

The regression studies done by Plaintiffs' expert, Dr. Mark Killingsworth,[50] were intended to determine whether female employees at the Club were being treated differently than comparable male employees with respect to salary and, in the case of logit analysis, assignment to salary grade. The employees on whom the regression models were based consisted of two randomly-drawn samples of those employees found on the year-end tapes of 1972 and 1978. The regression models were designed to account for a progressively greater number of variables, ranging from a basic model containing six variables based on sex, age, and tenure to a "full set" model containing approximately 128 variables. In the latter model, Killingsworth included a wide range of factors designed to take into account the variety of personal and historical characteristics a person would have on first being hired by the Club—for example, education, prior work or military experience, the number of years since that experience, interruptions in work experience, and so on. Whether the basic or more complex models are employed, however, the intent is to determine the effect of gender on salary or grade assignment *holding constant* the impact of the other variables described.

Killingsworth bases his analysis on the premise that men and women can be deemed "comparable" to the extent they share these "productivity-related" characteristics, and that, barring acts of discrimination, comparable individuals will be treated comparably with respect to conditions of employment—in this case, wages. At the same time, he rejects any consideration of so-called "Company variables"—that is, those factors which reflect an employee's treatment by the Company after hire in matters of salary, job assignment, promotions, or disciplinary incidents, for example—on the grounds that their influence is tainted inasmuch as these factors are likely vehicles of discrimination themselves. In other words, they, like salary, are *results* of the Company behavior under examination. Their inclusion, he argues, would tend to mask the actual effect of Company practice with respect to sex to the extent that it occurs in the context of current job assignment, salary grade, or other Company variables. [Tr. 2944–2952, 2969–2970.]

Killingsworth's conclusions are simply stated:

> As of year end 1978, the Auto Club maintained a systematic pattern of paying female employees less than comparable male employees.

> These differences are highly statistically significant. . . . [I]t is highly improbable that this finding . . . is attributable to chance.

---

**49.** The chief exception is the area of wage discrimination. Although I am able to find that Defendants did discriminate with respect to wages on the basis of the limited statistical evidence and more extensive lay testimony already discussed, the regression results do support that conclusion directly and may be considered an aspect of the prima facie case for these purposes. *Cf.* Plaintiffs' Exhibit 413.

**50.** As noted previously, the studies were co-authored by his colleague and collaborator, Dr. John Abowd of the University of Chicago.

These differences are very substantial in economic terms. . . . [T]he average amount by which women are paid less than comparable male Auto Club employees is . . . in excess of $4000 per year. In other words, being female rather than a male with the same productivity characteristics appears . . . to lead to a reduction in compensation of between 30 and 55 per cent, on average. [Plaintiffs' Exhibit 403.]

Furthermore, because of the nature of the regression model and technique, that difference is not reasonably attributable to individual characteristics brought to the Club. The actual size of the differential cited by Killingsworth is derived from the "full set" model based on employees hired since 1974 and active at year-end 1978; for other groups in the 1978 sample—e. g., all employees or those hired since 1972—and for the other regression models, the figures are much larger. Results of the analysis computed in terms of male weekly wage advantage are similar to the annual salary figures.

Assignment to salary grade was also examined by a statistical method (logit analysis), which, like regression, attempts to determine a particular outcome dependent on a variety of variables. Unlike regression, however, logit analysis is better suited to discrete, rather than continuous, outcomes—e. g., assignment to a particular grade as opposed to salary. In order to determine whether comparable men and women were being assigned to comparable grades, Killingsworth divided the Company's grade system into high (in essence, grades 7–27) and low (grades 1–6) grades, had the 1978 sample divided by male and female into their actual salary grades, and compared that distribution with their suggested distribution "if [females] had been treated in the same manner as their otherwise comparable male colleagues" and males redistributed in the same way. In brief, Killingsworth concluded that, had females been listed similarly to comparable males, approximately 67% of the women at the Club would have held positions in the high salary grades as opposed to the 12%

who actually did so at year-end 1978; male realignment from high to low grades would have been almost as drastic under the same conditions. The results of the logit analysis were, according to Killingsworth, highly statistically significant.

By way of contrast, Defendants' expert, Dr. J. Wanzer Drane constructed a single regression equation containing six variables for the purpose of determining whether female employees progress in salary at different rates than similarly situated male employees. Males and females are considered similarly situated for these purposes not by reference to their productivity-related characteristics, but rather to their employment in the same EEO job category. The regression equation was based on the entire active work force from 1974–1978.

The variables considered by Dr. Drane include tenure with the Club, tenure in the present job, 1974 salary multiplied by a constant, and gender; the dependent variable, once again, is salary at year-end 1978. In all but one of Dr. Drane's ten job categories, he claimed to have found no statistically significant disparities in salary progress. The remaining category of service workers proved, on closer examination, not to have significant disparities, in his opinion, when controls for part-time and full-time job assignments were imposed.

Even from this brief description of the two studies, it is apparent that the parties' disagreements run far deeper than merely the kinds of results they have produced. As the testimony and briefs make clear, there are several points on which the parties have fundamentally different views. These points are discussed here briefly because I believe they indicate in part the weight that I have given the regression evidence in this case.

First, Defendants attack vigorously Killingsworth's use of productivity-related variables and the definition of comparability that he bases on these variables. In particular, Defendants dispute the statistical value of employing so great a number of variables after the point at which it appears

their explanatory value has declined or ceased altogether. Plaintiffs, on the other hand, argue that these variables reflect the kinds of reasons an employer might have for treating employees differently and that controlling for their effect is a way of determining whether that might be the case. In this respect, Dr. Drane appears to concede that use of a number of variables for this purpose may be helpful. [Tr. *948–49.] This explanation of the use of so many variables, of course, reinforces the true rebuttal nature of Plaintiffs' regressions.

Second, Defendants object to Plaintiffs' rejection of Company-related variables on the ground that these factors—e. g., initial job at the Club, subsequent promotions or transfers, or salary—are far more reliable indicators of the 1978 salary which the regression equation is designed to generate than the productivity factors used by Plaintiffs. As I have already discussed, Plaintiffs' reasons for not entering such variables (except to the extent they are reflected in an employee's tenure, which is used) are based on their reluctance to include in an equation designed to determine the existence of discrimination certain factors which themselves are subject to, and evidence of, an employer's discriminatory behavior. In this matter, I am in agreement with Plaintiffs that, given the purposes of their study, the reasons for excluding these factors are sound and of considerable weight.

These matters, however, are reflections or manifestations of the greatest difference between the two regressions—the fact that they were created and designed to perform different functions. No inconsistency exists, I believe, if I accept both analyses on their own terms, notwithstanding the efforts of the parties to cast them in opposing lights. In fact, the regression address different questions, and within their respective frameworks, both are helpful.

Dr. Drane's regression equation was clearly designed to predict as accurately as possible year-end 1978 salaries on the basis of selected data. [Tr. *936.] Of primary importance in his analysis is the use of year-end 1974 salaries, which account (not surprisingly) for a large measure of the accuracy of his equation. [See, Tr. *773.] When all of the factors are included, Drane concludes that the rates of salary progression for male and female employees between 1974 and 1978 are not disparate in a statistically significant fashion. His preferred measure of the validity of this conclusion is the regression model's ability to predict accurately 1978 salaries on the basis of specifically selected test data.

Dr. Killingsworth's purpose, however, was markedly different. "Our objective in these studies was to determine whether the Auto Club has maintained a systematic statistical pattern of discrimination against female employees. . . ." [Plaintiffs' Exhibit 403, p. 2.] Or, more technically, "To develop causal inferences using the regression device about the systematic relation between productivity related factors and sex, and in particular to develop positive inference [sic] about the overall systematic relationship between sex and salary, holding these productivity factors constant as factors." [Tr. 3179–3180.]

As I understand these positions, one model is useful for determining what an average salary will be given the personnel data available, the other is useful for determining whether a particular factor (in this case, sex) plays a significant role in the amount of that salary. I am not troubled by the fact that an analysis of the latter type may not function as a predictive model as well as the former; nor do I believe that these are grounds for rejecting anything which the Killingsworth study may have to say on the issue of sex as an influence on salary. By the same token, Dr. Drane's analysis has contributed information regarding the rate of salary progression which I also accept on its own terms.

Finally, both parties offer lengthy criticisms of the statistical techniques and methods used by the other. In view of the manner in which I have made use of this evidence, however, it is not necessary to determine the statistical merits of each analysis even were I qualified to do so. As I stated at the outset, this evidence is pri-

marily corroborative; in no single instance has either regression study been the basis for any of the findings contained in this opinion.[51] While this view of the regression evidence may not reflect the amount of time and effort spent by the parties in this area of the case, I find it wholly consistent both with the scope and importance of the remaining statistical and lay evidence in this case and with the appropriate burden of proof to be borne by each party.

## VI. Conclusion

In broad terms, Plaintiffs challenge the entire range of Company employment policies which affect its female employees on the ground that those policies and practices violate Title VII of the Civil Rights Act of 1964. In particular terms, Company policies concerning certain hiring and application procedures, the posting of job openings, the process of evaluating job descriptions and requirements, reliance on the discretionary hiring authority of male managers, and the imposition of quotas on female hires are attacked because of their adverse impact on women. Other practices—relating to affirmative action, promotions and transfers, wage levels, and pregnancy—are cited as examples of the Company's disparate treatment of the women workers. These charges are made by the named Plaintiffs on behalf of three different classes: the class of present employees, the class of former employees, and the class of applicants for employment at the Company.

In support of their claims, Plaintiffs presented a substantial body of statistical as well as testimonial evidence. On the whole, Plaintiffs' statistics tended to show that women are employed at the Club primarily in clerical positions or in clerical supervision. Furthermore, female employees are significantly underrepresented in the better paying Professional, Technical, and Sales positions that are dominated by males.

In addition, testimony of several current and former employees established the differences in Company treatment of women with respect to unequal wages paid for equal work and the difficulty of obtaining promotions and transfers to better-paying jobs. Throughout the testimony, Company managers and supervisors described their understanding of the Company affirmative action policy and the steps taken to implement it.

On the basis of the credible testimony and other evidence in this case, I restate my conclusions:

First, Plaintiffs have established, and Defendants have failed to refute, that the Defendants' policies regarding job posting, job descriptions and requirements, and managerial discretion have had, and continue to have, a disparate impact on women. Insufficient evidence exists on this record, however, for me to conclude that Defendants have set quotas or that, if set, they are detrimental to women.

Plaintiffs have also established that Defendants have treated their female employees in a disparate manner contrary to Title VII with respect to wages, promotions and transfers and pregnancy. Defendants have failed to articulate a legitimate, nondiscriminatory reason for such treatment.

Second, I conclude that Plaintiffs have succeeded in demonstrating that Defendants' hiring and application procedures do have a disparate impact on female applicants in general and specifically on women applying for clerical positions. Plaintiffs have failed to show, however, an adverse impact on females applying for the Professional, Technical, and Sales positions.

Finally, although my previous conclusions concerning the class of present employees apply to former employees as well to the extent of their previous employment at the Club, I conclude that Plaintiffs have failed to prove that any of the former employees on whose behalf evidence was presented were victims of retaliation or constructive discharge.

Before concluding, I am constrained to comment on the involvement of Focus: Hope, a non-profit community relations

---

**51.** *But note* footnote 49.

agency, in this case. Defendants have been very critical of this organization's zeal in financing this litigation. Pretrial proceedings involved lengthy hearings regarding its role and the work of several of its employees.

What must be noted is that the Court was and remains satisfied as to the integrity of Plaintiffs' claims. That Focus: Hope saw as one of its objectives the support of Plaintiffs in this arduous litigation is not an issue in this case. In the open society in which American ideas and ideals as expressed in our law best flourish, there must always be room for advocates, for private attorneys general, who seek to implement these rules of law.

Having concluded that in certain respects Defendants are liable under Title VII for denying female employees the equal employment opportunities to which they are entitled, I must now determine appropriate remedies. Separate hearings on that issue will be scheduled on dates to be announced by the Court.

Plaintiffs may submit an order.

## APPENDIX I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL GREENSPAN, CAROLYN MADDEN, ORA LEE JASPER, and ALTHA BROWN, Individually and on behalf of all persons similarly situated,

Plaintiffs,

v.

AUTOMOBILE CLUB OF MICHIGAN, DETROIT AUTOMOBILE INTER-INSURANCE EXCHANGE, MOTOR LAND INSURANCE AND GROUP INSURANCE COMPANY OF MICHIGAN,

Defendants.
_____/

## ORDER AMENDING ORDER CERTIFYING CLASS ACTION

At a session of said Court held in the Federal Building, Detroit, Michigan, on MAY 19, 1977.

PRESENT: HONORABLE JOHN FEIKENS

UNITED STATES DISTRICT JUDGE

This matter having come on to be heard on Plaintiffs' Motion for Class Certification, the parties having been represented by their respective counsel, briefs having been submitted, oral argument having been heard in open court, and the Court being fully advised in the premises;

IT IS HEREBY ORDERED that Plaintiffs' Motion to Certify this action as a class action is granted;

IT IS FURTHER ORDERED that:

(1) Plaintiffs are the representatives of the general class of all women who are presently employed by Defendants in the State of Michigan; a sub-class of women who were formerly employed by the Defendants in Michigan, and a sub-class of women applicants who might be or might have been employed by Defendants in the State of Michigan;

(2) The class of present employees shall include all women employed by Defendants in Michigan who claim to have suffered discrimination based on sex on or subsequent to June 10, 1974.

(3) The class of former employees shall include all women formerly employed by Defendants in Michigan who claimed to have suffered discrimination based on sex on or subsequent to January 8, 1974;

(4) The class of applicants shall include all women who might be or might have been employed by Defendants in Michigan who claim to have suffered discrimination based on sex on or subsequent to January 8, 1974; and

(5) Notice is required to be sent to members of the classes and each member shall be given an opportunity to opt out of her class. A form of notice shall be served and filed by Plaintiffs for this Court's approval. Expenses of notice shall be borne by Plaintiffs.

/S/John Feikens
United States District Judge